[Cite as *Evert v. Ohio State Univ.*, 2013-Ohio-5942.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

JOHN M. EVERT

    Plaintiff

    v.

THE OHIO STATE UNIVERSITY

    Defendant

Case No. 2012-03719

Magistrate Robert Van Schoyck

DECISION OF THE MAGISTRATE

{¶ 1} Plaintiff brought this action alleging violations of the Family and Medical Leave Act of 1993 (FMLA), disability discrimination under R.C. 4112.02 and 4112.99, and equitable and promissory estoppel. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2} As an initial matter, immediately after the conclusion of the proceedings, on April 3, 2013, plaintiff filed a "Motion for Leave to File an Amended Complaint to Conform to the Evidence Pursuant to Civil Rule 15(B) Instanter." Defendant filed a memorandum in opposition on April 22, 2013. On April 29, 2013, plaintiff filed a motion for leave to file a reply instanter, which is GRANTED. Upon review, the motion for leave to amend the complaint is GRANTED. All other pending motions are DENIED as moot.

{¶ 3} Plaintiff testified that his employment with defendant began in 2004, when he worked as a part-time patient transporter while attending school for an associate's degree in cardiac sonography. In November 2008, defendant hired plaintiff for a full-time position as a technician in the cardiac sonography lab at the Ross Heart Hospital. The lab operates Monday through Friday, 8:00 a.m. to 4:30 p.m., and there is a technician on call to work at all other times. Technicians are responsible for taking

ultrasound images of patients' hearts, and these tests generally take about one hour to complete, with each technician completing about seven tests per day. According to plaintiff, the tests are ordered by doctors who are concerned about patients' hearts, doctors typically look at the results soon after the tests are performed, and the tests sometimes detect heart emergencies. Plaintiff testified that some of the tests are ordered to be done immediately, or "stat," and that at times the lab even receives such calls during surgeries. The lab has six rooms outfitted with testing equipment, and there are also three sets of portable equipment that are used elsewhere on the premises, including Doan Hall, James Cancer Hospital, and Rhodes Hall, for patients who cannot travel to the lab.

{¶ 4} Mary Ellen Orsinelli, R.N., who is the Lead Technician and has worked in the lab for 17 years, testified that many of the tests are ordered in preparation for surgery and that the tests often reveal urgent and previously unknown heart issues. According to Orsinelli, the tests are important to doctors, and doctors insist that the tests be promptly administered. Among other responsibilities, Orsinelli answers the phone in the lab that is dedicated to "stat" calls and is responsible for both the daily prioritization of patients and the scheduling of staff. Orsinelli stated that she sets a schedule in two-week increments, generally assigning one technician for each of the six testing rooms in the lab, three technicians for the portable testing equipment, and an on-call technician. Orsinelli explained that most of the patients seen by the technicians are inpatients (hospitalized anywhere in the medical center, not just Ross Heart Hospital) and that the number of inpatients varies from day to day, but that the technicians try, and usually succeed, in fulfilling all the orders for inpatient testing by the end of each daily shift, with the exception of Mondays, which is the busiest day and usually results in a handful of orders left over to be done the next day; in contrast, plaintiff testified that there were orders left over on most days. Orsinelli further explained that outpatients, who comprise

a minority of patients overall, may be scheduled for testing weeks or months in advance.

{¶ 5} Imaging Manager Julie Comyns has supervised the lab and approximately 60 employees since 2008, and she also managed other medical imaging labs prior to her employment with defendant. While Comyns was plaintiff's supervisor, Orsinelli also had some authority over him, and both of them interviewed plaintiff and were involved in his hiring. Comyns stated that soon after plaintiff's hiring, she noticed that he was taking a significant amount of leave. Six months into plaintiff's tenure, on April 28, 2009, and as provided for in defendant's attendance policy, Comyns and Orsinelli met with him to review his attendance issues and warn him that he was in violation of the attendance policy by exceeding the number of absences allowed in a rolling six-month period; the policy provides that "Four (4) or more occurrences of sick leave or absences" in a rolling six-month period may result in corrective action "up to and including termination." (Plaintiff's Exhibit 37.) Plaintiff's excessive absenteeism continued, however, prompting Comyns and Orsinelli to meet with him again on July 15, 2009, and issue him a written reprimand for violating the attendance policy. (The court notes that the reprimand was issued to "John Carney" inasmuch as plaintiff adopted his present surname later, in August 2009.) (Defendant's Exhibit B; Plaintiff's Exhibits 9, 37.)

{¶ 6} Plaintiff testified that his absences were largely attributable to medical issues, particularly migraine headaches, which he has suffered throughout his adult life, and that when Comyns and Orsinelli issued him the written reprimand, they suggested that if he were going to continue having medical issues he should talk to his doctor about the FMLA. Thereafter, plaintiff submitted a July 24, 2009 FMLA certification from Dr. Xiao-Song Zhao, providing that plaintiff may need intermittent leave one to three times a month, for one to three days at a time, due to migraines. (Defendant's Exhibit VV; Plaintiff's Exhibit 11.) This was the first in a series of FMLA certifications that plaintiff submitted, including a June 22, 2010 FMLA certification from Dr. Jaclyn Laine

providing for intermittent leave three times per month, for five hours at a time, due to head pain (Defendant's Exhibit VV; Plaintiff's Exhibit 14); a June 25, 2011 FMLA certification from Dr. Chad Hoyle providing for intermittent leave three times per month, for one day at a time, due to migraines and fibromyalgia (Defendant's Exhibit VV; Plaintiff's Exhibit 1); an October 31, 2011 FMLA certification from Dr. Douglas Darr providing for intermittent leave about once a week, for about two hours at a time, for chiropractic care to relieve migraines (Defendant's Exhibit VV); a November 1, 2011 FMLA certification from Dr. Hoyle providing for intermittent leave eight times per month, for up to five days at a time, due to migraines (Defendant's Exhibit VV); a February 2, 2012 FMLA certification from Dr. Troy Schaffernocher providing for intermittent leave once a year, for one to three days at a time, due to sleep apnea and asthma (Plaintiff's Exhibit 20); and, an April 5, 2012 FMLA certification from Dr. Kevin Hackshaw providing for intermittent leave about twice a month, for three days at a time, due to migraines, fibromyalgia, and restless leg syndrome (Defendant's Exhibit VV; Plaintiff's Exhibit 22). Additionally, a July 25, 2011 FMLA certification from Dr. Kathryn Pool provided for leave relating to childbirth and pre-natal care for plaintiff's wife. (Plaintiff's Exhibit 18.) Comyns approved all of the foregoing FMLA certifications.

{¶ 7} Plaintiff took a substantial amount of FMLA leave, intermittently and often unplanned, mostly due to migraine headaches and fibromyalgia. Plaintiff testified that Orsinelli seemed bothered by this and told him at one point that she would not have hired him if she had known about his medical issues; Orsinelli acknowledged making a statement to the effect that she wished she had known of plaintiff's medical issues before hiring him, but explained that it resulted from her frustration in struggling to maintain quality patient care in spite of plaintiff's absences. Plaintiff also testified that on several occasions, Orsinelli denied his requests to take FMLA leave for medical appointments; however, plaintiff did not provide any documentation or other corroborating evidence regarding this allegation, defendant presented approximately

135 leave requests from plaintiff which were all granted (Defendant's Exhibit NN), and Comyns and Orsinelli testified that they have no recollection of ever denying one of his leave requests.

{¶ 8} Plaintiff admitted that nearly a year after he began using FMLA leave, on April 7, 2010, Comyns and Orsinelli met with him to discuss a disproportionate pattern of unplanned absences on Mondays, Fridays, and days before or after holidays, which was particularly problematic because those tended to be the days with the highest volume of patients. Plaintiff also acknowledged that when he or any other technician called in an unplanned absence, their work had to be reassigned to other technicians, typically resulting in either a testing room or a portable testing machine not being available for patients that day. Although plaintiff testified that doctors could perform the testing themselves if they had the proper equipment, he admitted that the technicians are faster, and, Orsinelli testified that the tests performed by technicians in the lab are the best quality.

{¶ 9} Orsinelli testified that plaintiff missed far more time than any other technician and that his unplanned absences burdened the rest of the technicians and had a negative effect on morale. She explained that when an unplanned absence occurs, she has to adjust the remaining technicians' schedules, typically by closing one of the testing rooms in the lab or not using one of the portable testing units, and that the remaining technicians strive to make up for some of the tests that the absent technician would have performed, but that such absences almost inevitably result in fewer patients being seen. Comyns stated that as a result of plaintiff's unplanned absences, other technicians sometimes had to work overtime due to their increased workload and it placed a real strain on the lab. She explained that the absences increased over time and became particularly troublesome in the latter months of 2011, at which time she received complaints from doctors and administrators about testing not being performed quickly enough. Comyns testified that she consequently contacted defendant's human resources office and expressed her concerns.

{¶ 10} At the direction of human resources staff, including Employee Relations Consultant Danielle Dankof, Comyns drafted a formal letter requesting that the human resources office look into what she described as the hardship being placed upon her department. The final draft, dated March 1, 2012, noted that patient care was being affected by plaintiff's absences, particularly by portable tests–which tend to be more urgent–being delayed, and that the other technicians were dissatisfied with having to increase their workload to cover for plaintiff. (Plaintiff's Exhibit 54.) The letter also noted that plaintiff had missed an average of 4.5 days per month in the preceding five months, and that his most recent FMLA certification from Dr. Hoyle provided that he may have as many as eight intermittent absences per month, for up to five days at a time. While records show that not all of plaintiff's unplanned absences over those last five months related to migraines or fibromyalgia, since April 2011 plaintiff averaged about two full days each month of unscheduled leave relating just to those conditions, and he had several more occurrences of unscheduled leave for various medical reasons over that time (notwithstanding leave relating to pregnancy and childbirth). (Plaintiff's Exhibit 34; Defendant's Exhibits I, NN.)

{¶ 11} After plaintiff took an unplanned four-day absence utilizing FMLA leave for migraines and fibromyalgia from April 3-6, 2012, Comyns and Dankof met with him on the day he returned, Monday, April 9, 2012. Dankof informed plaintiff that he was being placed on continuous leave and would not be permitted to resume work unless and until he could provide documentation from a medical care provider showing that his restrictions had changed such that he would no longer need as many unplanned, intermittent absences as he had been taking. Dankof testified that she explained to plaintiff that his history of absences and the potential absences identified in his FMLA certifications represented a burden to his department that could not be accommodated. In both that meeting and in subsequent e-mail correspondence, Dankof referred plaintiff to defendant's Americans with Disabilities Act (ADA) coordinator, Scott Lisner. At trial,

Dankof noted that regular attendance is a high priority for defendant due to patient care and safety considerations, as demonstrated by the fact that it has a formal attendance policy but the main campus of Ohio State University does not. Defendant's attendance policy provides, in part: "The fulfillment of the Medical Center's mission of patient care, education, and research requires regular attendance on the part of all staff members. Regular and consistent attendance is considered an important performance standard." (Plaintiff's Exhibit 37.)

{¶ 12} The day after the meeting, April 10, 2012, Comyns sent plaintiff an e-mail stating that if he was not able to return to work under the terms discussed, in addition to his remaining balance of FMLA leave he was eligible for six months of unpaid leave that defendant offers its employees, and she also suggested that he contact defendant's "Integrated Disability" office to determine if he would be eligible for any disability benefits during any period of unpaid leave. (Plaintiff's Exhibit 24). Also on that day, Dankof sent plaintiff an e-mail memorializing their discussion at the meeting, informing him of his eligibility for the six months of unpaid leave, providing the ADA coordinator's contact information, and also apologizing for any confusion regarding the fact that their discussion had focused on FMLA, but "the real concern is that you have an ADA qualifying condition that your department cannot accommodate based upon your frequent, unpredictable, intermittent absences." (Plaintiff's Exhibit 25.)

{¶ 13} Plaintiff never provided any further documentation or information to defendant about his health, nor did he make any changes to his existing FMLA certifications, despite testifying that his health was improving at that time. Although plaintiff had just returned from four straight days of leave for migraines and fibromyalgia, Dr. Hoyle testified by deposition that plaintiff's migraines did seem to be improving by May 2012 such that he would not have needed as much leave as he had been taking. (Plaintiff's Exhibit 68.) Plaintiff retained legal counsel and exchanged several e-mails with Dankof about the matter in April 2012, but he ultimately exhausted his remaining FMLA leave balance, filed the instant lawsuit on May 1, 2012, and utilized the six

months of unpaid medical leave offered by defendant.  On October 25, 2012, Tom Ramey, defendant's Director of Employee/Labor Relations, sent plaintiff a letter stating that his six months of unpaid leave would expire and he would be terminated effective November 26, 2012, unless he provided evidence of a change in his medical status. (Plaintiff's Exhibit 31.)  Indeed, defendant terminated plaintiff's employment effective November 26, 2012.

{¶ 14} Plaintiff asserts claims for interference with FMLA rights under 29 U.S.C. 2615(a)(1), retaliation for exercising FMLA rights under 29 U.S.C. 2615(a)(2), discrimination on the basis of a perceived disability under R.C. 4112.02 and 4112.99, and both equitable and promissory estoppel.

**FMLA**

{¶ 15} "The FMLA entitles qualifying employees to up to twelve weeks of unpaid leave each year if, among other things, an employee has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir.2005), quoting 29 U.S.C. 2612(a)(1)(D).   Pursuant to 29 U.S.C. 2612(b), FMLA leave may be taken "intermittently or on a reduced leave schedule when medically necessary."

{¶ 16} "There are two separate theories of recovery under the FMLA: the 'interference' theory and the 'retaliation' theory.  *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir.2004).   The 'interference' theory is based on 29 U.S.C. 2615(a)(1), which states that employers cannot 'interfere with, restrain, or deny the exercise of or attempt to exercise, any right provided . . .' by the FMLA.  In order to state an interference claim pursuant to the FMLA, [plaintiff] 'must show that (1) he was an eligible employee; (2) [defendant] was an employer subject to the FMLA; (3) he was entitled to leave under the FMLA;  (4) he gave [defendant] notice of his intention to take FMLA leave; and (5) [defendant] denied him FMLA benefits to which he was entitled.'"

*Gates v. United States Postal Serv.*, 502 Fed.Appx. 485, 488-489 (6th Cir.2012), quoting *Romans v. Mich. Dept. of Human Servs.*, 668 F.3d 826, 840 (6th Cir.2012). "The 'retaliation' or 'discrimination' theory arises from 29 U.S.C. 2615(a)(2), which states that an employer cannot 'discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.' To establish a prima facie case of retaliation pursuant to the FMLA, [plaintiff] must establish that (1) he was engaged in an activity protected by the FMLA; (2) the employer knew that he was exercising his rights under the FMLA; (3) after learning of his exercise of FMLA rights, the employer took an employment action adverse to him; and (4) there was a causal connection between his protected FMLA activity and the adverse employment action." *Id.* at 489.

{¶ 17} One of the rights or benefits afforded by the FMLA is that an employee returning from FMLA leave is generally entitled to be restored to the position the employee held when the leave commenced, or to an equivalent position. 29 U.S.C. 2614(a)(1); 29 C.F.R. 825.214. But, "[i]f the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition or an injury or illness also covered by workers' compensation, the employee has no right to restoration or to another position under the FMLA." 29 C.F.R. 825.216(c); *see also Blake v. UPMC Passavant Hosp.*, 394 Fed.Appx. 940, 941 (3rd Cir.2010) ("the ability to perform the essential functions of the job is a prerequisite to protection" under the FMLA).

{¶ 18} Within the context of the FMLA, the term "essential functions" of an employee's position has the same meaning as it does under the ADA. 29 C.F.R. 825.123(a). "It is a 'rather common-sense idea . . . that if one is not able to be at work, one cannot be a qualified individual.' *Waggoner v. Olin Corp.*, 169 F.3d 481, 482 (7th Cir.1999). Both before and since the passage of the ADA, a majority of circuits have endorsed the proposition that in those jobs where performance requires attendance at the job, irregular attendance compromises essential job functions." *Samper v.*

*Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir.2012) (regular attendance was an essential job function of a neo-natal intensive care unit nurse).

{¶ 19} Indeed, "[t]he FMLA does not require an employer to allow an employee to stay in a position that the employee cannot perform." *Hatchett v. Philander Smith College*, 251 F.3d 670, 677 (8th Cir.2001). "Courts have been reluctant to read the FMLA as allowing unscheduled and unpredictable, but cumulatively substantial, absences, when the Americans with Disabilities Act protects only persons who over the long run are capable of working full time." *Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1007 (7th Cir.2001). "So long as 'reliable attendance is a bona fide requirement' of a position, an employee's inability to comply with that requirement over the long term indicates that he is not qualified for the position, and therefore not eligible for leave under the FMLA." *Hayduk v. Johnstown*, 580 F.Supp.2d 429, 455 (W.D.Pa.2008); *see also Carmona v. Southwest Airlines Co.*, 604 F.3d 848, 860 (5th Cir.2010) ("while the FMLA can excuse an employee from his employer's ordinary attendance requirements, it does not do so where the employee requests the right to take intermittent leave without notice indefinitely.").

{¶ 20} The court finds that "regular and consistent attendance" (to quote from defendant's attendance policy) is a bona fide requirement of the position that plaintiff held. Doctors throughout defendant's hospitals who are concerned about patients' hearts rely on the cardiac sonography technicians to perform ultrasound testing of the heart, often on an emergent basis or in preparation for surgery, and these tests can be life-saving in that they routinely identify previously unknown defects or other issues with the heart. These tests must be done in a timely fashion, and in order to do so, it is absolutely critical that a team of technicians is regularly and consistently available to see patients both in the lab and with portable testing equipment.

{¶ 21} After being counseled for excessive absenteeism just six months into his tenure and later being reprimanded for the same, plaintiff obtained FMLA certifications,

the last of which that was filed before his placement on continuous leave provided that he could intermittently be absent as many as eight times per month, for up to five days at a time due to migraines. For more than two years defendant attempted to accommodate plaintiff, but as his intermittent absenteeism never improved, and indeed worsened by late 2011, it became apparent that his absences caused delays in patient care, caused medical equipment to go unused, and had an adverse impact on the team of technicians. While plaintiff downplayed the effect upon patient care, the court finds Comyns and Orsinelli's testimony to be more credible in this regard. Plaintiff's job was part of a team at a busy hospital, working directly with patients to perform vital, time-sensitive tests on their hearts, and in order to make use of all the testing machines and see as many patients as possible, it was essential that each technician regularly and consistently show up for work and put in a full shift. The court finds, under these facts, that the FMLA did not afford plaintiff the right or benefit to such unplanned, unpredictable, and cumulatively substantial absences. The court further finds that plaintiff was unable to perform an essential function of his job, i.e., maintaining regular and consistent attendance. Thus, the court finds that plaintiff did not have a right under the FMLA to the intermittent leave he sought for migraine headaches and fibromyalgia, that he did not have a right under the FMLA to be restored to his position, and that was not denied any FMLA benefits to which he was entitled.

{¶ 22} Moreover, the court finds that there was no causal connection between any protected FMLA activity and any adverse employment action. Defendant declined to reinstate plaintiff to his position and ultimately terminated his employment because he could not maintain regular and consistent attendance, a problem that existed throughout his tenure and for which he was reprimanded before he ever invoked the FMLA. Although plaintiff has argued, at least at the summary judgment stage, that a one-percent raise he received in conjunction with a December 2011 performance review was a retaliatory, adverse employment action, the court finds that such action, even if it could be considered "adverse," resulted from factors unrelated to the FMLA, including

his failure to get along with a co-worker and the fact that he conducted surreptitious audio recordings in the workplace.

{¶ 23} Accordingly, defendant is entitled to judgment on plaintiff's claims under the FMLA.


**DISABILITY DISCRIMINATION**

{¶ 24} With respect to plaintiff's claim of discrimination, R.C. 4112.02 states, in part:

{¶ 25} "It shall be unlawful discriminatory practice: (A) For any employer, because of the * * * disability * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment or any matter directly or indirectly related to employment."

{¶ 26} The federal ADA is similar to the Ohio disability discrimination law and courts can look to the regulations and cases interpreting the ADA for guidance in the interpretation of Ohio law. *Columbus Civ. Serv. Comm. v. McGlone*, 82 Ohio St.3d 569, 573 (1998).

{¶ 27} To establish a prima facie case of disability discrimination, a plaintiff must demonstrate: 1) that he was disabled; 2) that an adverse employment action was taken by his employer at least in part because plaintiff was disabled, and 3) that plaintiff, even though disabled, can safely and substantially perform the essential functions of the job in question. *Id.* at 571. "Because an employee must prove all three elements in order to establish a prima facie case of disability discrimination, the failure to establish any single element is fatal to a discrimination claim." *Taylor v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 11AP-385, 2011-Ohio-6060, ¶ 20.

{¶ 28} As previously discussed, plaintiff's inability to maintain regular, consistent attendance meant that he could not substantially perform an "essential function" of the

job within the meaning of that term under the ADA. Accordingly, plaintiff cannot establish one of the elements necessary for a prima facie showing of disability discrimination, and defendant is therefore entitled to judgment on this claim.

**ESTOPPEL**

{¶ 29} For his claims of equitable and promissory estoppel, plaintiff alleges that defendant represented to him that he could take leave under the FMLA "without any limitation or return to work certification," that defendant "promised him leave in accordance with the FMLA," and that he relied thereon to his detriment.

{¶ 30} "In order to establish a claim of equitable estoppel under the FMLA, an employee must show: (1) the employer made a definite misrepresentation of fact knowing the employee would rely upon it; (2) the employee reasonably relied upon the misrepresentation; and (3) the employee was harmed as a result of his/her reasonable reliance." *Hershberger v. Altercare, Inc.*, 5th Dist. No. 2006CA00167, 2007-Ohio-1452, ¶ 48. "To establish a claim for promissory estoppel, an employee must prove: (1) a clear and unambiguous promise, (2) made by the employer, (3) which the employer should reasonably and forseeably expect to induce reliance by the employee, and (4) upon which the employee must have actually relied and suffered injury as a result." *Miller v. Lindsay-Green, Inc.*, 10th Dist. No. 04AP-848, 2005-Ohio-6366, ¶ 35.

{¶ 31} Upon review, the court finds that plaintiff failed to demonstrate either a definite misrepresentation or a clear and unambiguous promise to the effect that he had a long-term entitlement to take cumulatively substantial intermittent, unplanned absences. Therefore, he cannot prevail on his claims for estoppel.

{¶ 32} Based upon the foregoing, the court finds that plaintiff has failed to prove any of his claims by a preponderance of the evidence. Accordingly, judgment is recommended in favor of defendant.

{¶ 33} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision*

*during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
ROBERT VAN SCHOYCK
Magistrate

cc:

Chelsea L. Berger                         Emily M. Simmons
Christopher L. Trolinger                   Randall W. Knutti
270 Bradenton Avenue, Suite 100           Assistant Attorneys General
Dublin, Ohio 43017                        150 East Gay Street, 18th Floor
                                          Columbus, Ohio 43215-3130

001
Filed August 30, 2013
Sent to S.C. Reporter April 30, 2014