**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MONIKA SAMPER,

*Plaintiff-Appellant,*

v.

PROVIDENCE ST. VINCENT MEDICAL
CENTER,

*Defendant-Appellee.*

No. 10-35811

D.C. No.
3:09-cv-01182-AC

OPINION

Appeal from the United States District Court
for the District of Oregon
John V. Acosta, Magistrate Judge, Presiding

Argued and Submitted
December 8, 2011—Seattle, Washington

Filed April 11, 2012

Before: Ralph B. Guy, Jr.,* M. Margaret McKeown, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge McKeown

---

*The Honorable Ralph B. Guy, Jr., Senior Circuit Judge for the Sixth
Circuit, sitting by designation.

## COUNSEL

Thomas K. Doyle, BENNETT, HARTMAN, MORRIS & KAPLAN LLP, Portland, Oregon, for the plaintiff-appellant.

Jeffrey J. Druckman, Janine C. Blatt, DRUCKMAN & BLATT, P.C., Portland, Oregon, for the defendant-appellee.

## OPINION

McKEOWN, Circuit Judge:

This case tests the limits of an employer's attendance policy. Just how essential is showing up for work on a predict-

able basis? In the case of a neo-natal intensive care nurse, we conclude that attendance really *is* essential.

Monika Samper, a neo-natal intensive care unit ("NICU") nurse, sought an accommodation from her employer, Providence St. Vincent ("Providence"), that would have allowed her an unspecified number of unplanned absences from her job. She wanted to opt out of Providence's attendance policy, which sanctioned five unplanned absences of unlimited duration as well as other permitted absences. Samper appeals the district court's summary judgment in favor of Providence on her reasonable accommodation claim under the Americans with Disabilities Act ("ADA"). Because regular attendance is an essential function of a neo-natal nursing position at Providence, we affirm.

## BACKGROUND

Providence is a medical facility in Portland, Oregon, that provides a broad range of medical services. Its NICU offers a high level of intensive care to premature infants. According to the NICU charge nurse, absences among NICU staff can jeopardize patient care: NICU nurses require special training such that the universe of nurses that can be called in at the last minute is limited. As the charge nurse explains, given the relevant patient population, being understaffed is "highly undesirable and, potentially, can compromise patient care." Nonetheless, striking a balance between the needs of patients and employees, Providence's attendance policy allows its employees to take up to five unplanned absences during a rolling twelve-month period. In addition, "[u]nplanned absences related to family medical leave . . . jury duty, bereavement leave and other approved bases are not counted" towards this limit, and each absence, however long, counts as only one occurrence. Samper challenges the application of this generous absence policy to her circumstances.

Although Samper claims material issues of fact remain regarding the circumstances surrounding her dismissal, the sequence of events is undisputed.[1] Samper was employed with Providence as a registered NICU nurse for eleven years. Since at least 2005, she has had fibromyalgia, a condition that limits her sleep and causes her chronic pain. Over the entire period of her employment, Samper never worked full time, but, nonetheless, regularly exceeded the number of unplanned absences permitted even for full-time employees. In July 2000, while on leave of absence, Samper received a performance appraisal that reflected she had taken seven unplanned absences over the year, exceeding the number permitted by the attendance policy. She was informed her attendance needed improvement. In 2002, Samper was placed on work plans to manage her continued absences, the result, according to her, of a difficult divorce. At the time, Samper optimistically predicted that because her "personal life [had] dramatically improved in the last few months," her absences would decrease.

This was not to be. After two more years of attendance problems, and yet another negative attendance review, in August 2005 Samper's manager asked to meet with her and a leave-of-absence specialist to address Samper's chronic attendance problems. At the meeting, Providence agreed to a highly flexible accommodation: Samper was allowed to call in when having a bad day, and move her shift to another day in the week. Providence did not require Samper to find a replacement for her shift.

Providence's flexibility, however, yielded no results. By

---

[1]"We review the district court's grant of summary judgment de novo [and] . . . affirm the decision to grant summary judgment when, reviewing the record as a whole and drawing all reasonable inferences in favor of the nonmoving party, we find no genuine issue of material fact." *Vander v. United States Dep't of Justice*, 268 F.3d 661, 663 (9th Cir. 2001) (citations omitted).

July 2006, Samper admits that she once more exceeded the attendance policy, and received a corrective action notice that was later withdrawn.[2] Samper again met with management in August 2006, which agreed to yet another accommodation under which Samper's two shifts-per-week would not be scheduled on consecutive days. Again, despite hoped for improvement, Samper received a verbal warning at the end of the year because of her attendance. Samper responded by seeking an exemption from the attendance policy altogether.

Samper's absences and requests for further absences occurred against a backdrop of multiple other absences that were not counted towards the unplanned absence limit. For example, in early 2005, Samper obtained intermittent medical leaves. In November 2005, she was allowed to take time off to attend a trial involving her spouse. Although her attendance in early 2007 improved, by May 2007, Samper sought and was given a month-long leave of absence to obtain counseling. She received another medical leave of over two weeks in October. The following year, 2008, began with another two-week medical leave.

Although none of these leaves counted towards her unplanned attendance limit, despite ongoing accommodation, Samper was issued a corrective action notice in March 2008 for seven unplanned absences over the previous twelve-month period, some of several days in length. Matters came to a head in early 2008, when management informed Samper that her part-time position would cease to exist, and that she could transfer to another position or face termination. Samper responded by making inappropriate comments in the presence of patients. Providence issued two corrective action notices in March: one for seven unplanned absences over the previous

---

[2]We accept Samper's representation that she had only seven absences over the twelve-month period preceding the evaluation. However, the corrective action notice states that Samper had seventeen absences over the previous twelve months.

twelve months, and another for her comments. After two further unplanned absences in April, Samper was scheduled to discuss her attendance issues with management at a meeting at which Samper was (not uncharacteristically) absent. Samper was finally discharged for, among other issues, seven absences in a twelve month period, and general problems with attendance.

Samper filed suit alleging, among other claims, a violation of the ADA due to failure to accommodate. The district court granted summary judgment in favor of Providence, reasoning that because Samper was unable to adhere to Providence's attendance policy, she was unqualified for her position as a matter of law. The court also held that the 2006 part-time work plan was a reasonable accommodation, and that the accommodation that Samper requested, to obtain a waiver from the five unplanned absence limit, was unreasonable.

## DISCUSSION

**[1]** This case turns on the role that regular attendance plays in the functions of a NICU nurse. To establish a prima facie case for failure to accommodate under the ADA, Samper must show that "(1) [s]he is disabled within the meaning of the ADA; (2) [s]he is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) [s]he suffered an adverse employment action because of [her] disability." *Allen v. Pac. Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003); *see also* 42 U.S.C. §§ 12112(a), (b)(5)(A) (requiring reasonable accommodation). Providence does not dispute that Samper is disabled, that she has the requisite technical skills for the job, or that she suffered an adverse employment action. Samper runs into an insurmountable hurdle, however, in arguing that regular attendance is not an essential function of the NICU nurse position.

**[2]** An individual is qualified if "with or without reasonable accommodation, [she] can perform the essential func-

tions of the employment position . . . ." 42 U.S.C. § 12111(8). "The court first examines whether the individual satisfies the requisite skill, experience, education and other job-related requirements of the position. The court then considers whether the individual can perform the essential functions . . . with or without a reasonable accommodation." *Bates v. United Parcel Svc., Inc.*, 511 F.3d 974, 990 (9th Cir. 2007) (en banc) (internal quotation marks omitted). Although Samper retains the burden of proof in making her prima facie case, Providence has the burden of production in establishing what job functions are essential as "much of the information which determines those essential functions lies uniquely with the employer." *Id.* at 991 (citations and internal quotation marks omitted). To meet its burden of production, Providence "must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, *if believed by the trier of fact*, would support a finding" favorable to the defendant—in this case, that compliance with the attendance policy is an essential function of the job. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (emphasis in original, citation and internal quotation marks omitted).

**[3]** It is a "rather common-sense idea . . . that if one is not able to be at work, one cannot be a qualified individual." *Waggoner v. Olin Corp.*, 169 F.3d 481, 482 (7th Cir. 1999). Both before and since the passage of the ADA, a majority of circuits have endorsed the proposition that in those jobs where performance requires attendance at the job, irregular attendance compromises essential job functions. Attendance may be necessary for a variety of reasons. Sometimes, it is required simply because the employee must work as "part of a team." *Hypes v. First Commerce Corp.*, 134 F.3d 721, 727 (5th Cir. 1998). Other jobs require face-to-face interaction with clients and other employees. *Nowak v. St. Rita High Sch.*, 142 F.3d 999 (7th Cir. 1998) (teacher); *Nesser v. Trans World Airlines, Inc.*, 160 F.3d 442 (8th Cir. 1998) (airline customer service agent); *Tyndall v. Nat'l Educ. Ctrs.*, 31 F.3d 209 (4th Cir. 1994) (teacher). Yet other jobs require the

employee to work with items and equipment that are on site. *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943 (7th Cir. 2001) (en banc) (dockworker); *Jovanovic v. In-Sink-Erator*, 201 F.3d 894 (7th Cir. 2000) (tool and die maker); *Waggoner*, 169 F.3d 481 (production worker); *Corder v. Lucent Techs., Inc.*, 162 F.3d 924 (7th Cir. 1998) (telephone customer support); *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191 (4th Cir. 1997) (computer consultant); *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755 (5th Cir. 1996) (mechanic); *Jackson v. Veterans Admin.*, 22 F.3d 277 (11th Cir. 1994) (housekeeping aide); *Carr v. Reno*, 23 F.3d 525 (D.C. Cir. 1994) (coding clerk under the Rehabilitation Act); *Law v. U.S. Postal Serv.*, 852 F.2d 1278 (Fed. Cir. 1988) (mail handler under the Rehabilitation Act).

**[4]** The common-sense notion that on-site regular attendance is an essential job function could hardly be more illustrative than in the context of a neo-natal nurse. This at-risk patient population cries out for constant vigilance, team coordination and continuity. As a NICU nurse, Samper's job unites the trinity of requirements that make regular on-site presence necessary for regular performance: teamwork, face-to-face interaction with patients and their families, and working with medical equipment. Samper herself admits that her absences sometimes affected "teamwork and cause[d] a hardship for [her] coworkers who must cover for [her]." Similarly, once at work, Samper's tasks required her to "lift babies, push cribs and isolettes." More critically, she had to "get up at a moment's notice to answer alarms [and] . . . [o]ften . . . run to codes."

**[5]** Rather than merely relying on Samper's own admissions, or the logical presumption that it is essential for a nurse to be present regularly and predictably to do her job, Providence supplies evidence to meet its burden of production with alacrity. Providence notes that the written job description required strict adherence to the attendance policy. Under the heading "standards of performance," "Attendance" and

"Punctuality" are listed as essential functions. The more detailed statement provides that the employee must "[d]emonstrate[ ] performance by adhering to established policies and procedure and exhibiting the defined characteristics associated with attendance and punctuality." As Providence further explains in a declaration from Samper's former supervisor, NICU nurses must have specialized training, and it is very difficult to find replacements, especially for unscheduled absences. Understaffing compromises patient care. Providence's evidence meets its burden of production. *See* 29 C.F.R. § 1630.2(n)(3) ("Evidence of whether a particular function is essential includes, but is not limited to [t]he employer's judgment as to which functions are essential; . . . [w]ritten job descriptions; . . . [t]he consequences of not requiring the incumbent to perform the function; [and t]he current work experience of incumbents in similar jobs.").

The record shows that Samper's position differs from those considered by our sister circuits in only one important respect: Samper's regular, predictable presence to perform specialized, life-saving work in a hospital context was even *more* essential than in those cases. This is not a job where it is possible to argue, as in the case of the dockworker in *Yellow Freight*, that "workers were basically fungible with one another, so that it did not matter who was doing the [job] on any particular day; [and the employer] did not follow any fixed policy other than to treat each case individually, giving very lengthy leaves to people he found deserving." 253 F.3d at 958 (Wood, J., dissenting). As the First Circuit observed in rejecting a scheduling accommodation requested by a nurse, "[m]edical needs and emergencies—many potentially life-threatening—do not mind the clock, let alone staff-nurse convenience. . . . The 24-hour hospital unit setting thus affords a particularly compelling context in which to defer to rational staffing judgments by hospital employers based on the genuine necessities of the hospital business." *Laurin v. Providence Hosp.*, 150 F.3d 52, 59-60 (1st Cir. 1998).

**[6]** Samper offers nothing to rebut Providence's undisputed evidence except for highlighting that Providence's policy allows for some unplanned absences, and that her absences had exceeded those permitted under the policy in past years without repercussions. She claims, without evidence, that "[t]he impact on staffing levels resulting from an employee's first absence is the same as the impact from an employee's twentieth absence," and clings to our decision in *Humphrey v. Memorial Hosps. Ass'n* for support, where we noted that "regular and predictable attendance is not per se an essential function of all jobs." 239 F.3d 1128, 1135 n.11 (9th Cir. 2001).

Our observation that regular attendance is not necessary for all jobs is hardly remarkable when *on-site presence* is not required for all jobs, a point not lost on our sister circuits. *See Waggoner*, 169 F.3d at 485 ("In some jobs . . . working at home for a time might be an option."); *Jackson*, 22 F.3d at 279 ("[O]ther jobs . . . can be performed off site or deferred until a later day."); *Carr*, 23 F.3d at 530 ("Indeed, in appropriate cases, that section requires an agency to consider work at home, as well as reassignment in another position, as potential forms of accommodation."). Similarly, in *Humphrey*, a medical transcriptionist provided evidence that other transcriptionists were allowed to work at home, and therefore, his attendance was not required for performance. 239 F.3d at 1137. However, even when an employee "work[s] at home, . . . regular hours on a consistent basis" often remain a requirement. *Carr*, 23 F.3d at 530.

Samper's focus on *Humphrey*, the unusual case, blinds her to the rule. "Except in the unusual case where an employee can effectively perform all work-related duties at home, an employee 'who does not come to work cannot perform any of his job functions, essential or otherwise.'" *Yellow Freight*, 253 F.3d at 948 (quoting *Waggoner*, at 484-85). As the evidence easily establishes, Samper's engagement with patients is far more direct than that of a medical transcriptionist—

although attendance may not be necessary to *transcribe* details regarding medical treatment, in the context of a neonatal nurse, it is necessary to *provide* that treatment in the first place. Not only is physical attendance required in the NICU to provide critical care, the hospital needs to populate this difficult-to-staff unit with nurses who can guarantee some regularity in their attendance.

**[7]** Turning to the reasonable accommodation analysis, Samper attempts to gild the lily by claiming not that attendance in general is an essential function, but, rather that her proposed variation to the attendance policy constitutes a reasonable accommodation.

**[8]** Even under a "fact-specific, individualized analysis" of the accommodation, Samper's argument fails. *Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir. 1999). As Providence points out, "Samper never quantified the number of additional unplanned absences she was seeking," even though she could have done so at any time during her years-long negotiating with the hospital over attendance. As the Seventh Circuit observed in similar circumstances in *Yellow Freight* and *Jovanovic*, such behavior suggests that "the only imaginable accommodation" that would satisfy the employee "would be an open-ended schedule that would allow [her] to come and go as [s]he pleased." *Yellow Freight*, 253 F.3d at 951 (quoting *Jovanovic*, 201 F.3d at 899 n.9). In these cases, the court was "hard-pressed to imagine a manufacturing facility that could operate effectively when its employees are essentially permitted to set their own work hours." *Id.* To imagine a NICU facility, responsible for the emergency care of infants, operating effectively in such a manner, stretches the notion of accommodation beyond any reasonable limit. An accommodation that would allow Samper to "simply . . . miss work whenever she felt she needed to and apparently for so long as she felt she needed to [a]s a matter of law . . . [is] not reasonable" on its face. *Waggoner*,

169 F.3d at 485; *see US Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002).

**[9]** Indeed, Samper's request so far exceeds the realm of reasonableness that her argument leads to a breakdown in well-established ADA analysis. In most cases, the essential function and reasonable accommodation analyses are separate: first, a court inquires as to the job's essential functions, after which the plaintiff must establish that she can perform those functions with or without reasonable accommodations. *See Bates,* 511 F.3d at 994. Samper essentially asks for a reasonable accommodation that *exempts* her from an essential function, causing the essential functions and reasonable accommodation analyses to run together. Samper's approach would eviscerate any attendance policy, leaving the hospital with the potential for unlimited absences.

To be sure, as Samper emphasizes, the hospital did not adopt a no-tolerance policy. Her theory is essentially a "drop in the bucket" approach—if Providence permits five unscheduled absences plus other absences for all NICU nurses, additional absences by a single employee will hardly have any real effect on patient care. Providence acknowledges that it can work around five unplanned absences, so, as Samper's argument goes, it ought to be able to accommodate her for an unspecified number of absences. But this approach ignores recognition of employer needs and would gut reasonable attendance policies.

**[10]** Providence endeavored to balance the realities of illness, family matters and other unplanned emergencies faced by its employees against the vital demands of critical infant care, by cabining the overall number of absences. Samper's arguments do nothing to undermine Providence's principal claim, backed up with evidence: unplanned absences are a hardship to the NICU, and the written policy represents the outer limit to the number of unplanned absences that can be tolerated without serious repercussions on patient care.

**[11]** Providence was under no obligation to give Samper a free pass for every unplanned absence. Importantly, even though Samper "had fashioned a poor attendance record for [her]self well before [s]he was diagnosed," *Yellow Freight*, 253 F.3d at 951, Providence had already provided her with various accommodations. In 2005, Samper was allowed to call in when having a bad day, and move her shift to another day in the week; from 2006 her schedule comprised a maximum of two day-time shifts a week, with no two days back to back, along with a history of extended leaves not counted towards the attendance policy. We need not decide whether these accommodations exceeded Providence's ADA obligations. *Cf. Laurin*, 150 F.3d 52 (day-time only shifts accommodation for nurse unnecessary under the ADA). Despite Providence's Herculean efforts to accommodate her, Samper's attendance from 2005 until she was terminated never met the attendance policy requirements. As in *Yellow Freight*, "the fact that [the employer] had infinite patience with regard to [the employee's] poor attendance does not necessarily mean that every company must put up with employees who do not come to work." 253 F.3d at 948 (square brackets in original omitted). Ultimately, despite Providence's patience and accommodations, "there was literally nothing in the record to suggest that the future would look different from the past," leaving Providence with little choice but to terminate Samper. *Corder*, 162 F.3d at 928.

**[12]** Samper's performance is predicated on her attendance; reliable, dependable performance requires reliable and dependable attendance. An employer need not provide accommodations that compromise performance quality—to require a hospital to do so could, quite literally, be fatal.

AFFIRMED.