*636 MOORE, J., delivered the opinion of the court, in which HELMICK, D.J., joined. McKEAGUE, J. (pp. 649-56), delivered a separate dissenting opinion.
OPINION
KAREN NELSON MOORE, Circuit Judge.
At issue in this case is whether a telecommuting arrangement could be a reasonable accommodation for an employee suffering from a debilitating disability. Charging party Jane Harris was terminated from her position as a resale steel buyer at Ford Motor Co. (“Ford”) after she asked to telecommute several days per week in an attempt to control the symptoms of irritable bowel syndrome (“IBS”). The Equal Employment Opportunity Commission (“EEOC”) argues that Ford discriminated against Harris on the basis of her disability and retaliated against her for filing a charge with the EEOC. The district court granted summary judgment in favor of Ford. Because we find evidence in the record to create a genuine dispute as to whether Harris was qualified to work as a resale buyer and whether she was terminated in retaliation for filing an EEOC charge, we REVERSE the district court’s grant of summary judgment and REMAND for proceedings consistent with this opinion.
I. BACKGROUND
In 2003, Jane Harris was hired as a resale buyer at Ford. Resale steel buyers serve as intermediaries between steel suppliers and “stampers,” the companies that use steel to produce parts for Ford. R. 60-2 (Gordon Decl. ¶ 3) (Page ID # 1027). Their role is to respond to emergency supply issues to ensure that there is no gap in steel supply to the parts manufacturers. Id. ¶ 3-4 (Page ID # 1027-28). The position involved some individual tasks, such as updating spreadsheets and periodic site visits to observe the production process. R. 60-5 (King Dep. at 46) (Page ID # 1057). However, “the essence of the job was group problem-solving, which required that a buyer be available to interact with members of the resale team, suppliers and others in the Ford system when problems arose.” R. 60-2 (Gordon Decl. ¶ 11) (Page ID # 1034). Ford managers made the business judgment that such meetings were most effectively handled face-to-face, and that email or teleconferencing was an insufficient substitute for in-person team problem-solving. Id.; R. 60-4 (Jirik Deck ¶ 8) (Page ID # 1048-49); R. 60-3 (Gontko Deck ¶ 4) (Page ID # 1043). Another resale buyer on Harris’s team believed that she “could not work from home more than one day a week and be able to effectively perform the duties of the resale buyer position.” R. 60-8 (Pompey Deck ¶ 11) (Page ID # 1095). Harris worked in this role until September 2009, when she was terminated. R. 60-2 (Gordon Deck ¶ 26) (Page ID # 1040-41).
Harris was a consistently competent, though not perfect, employee. In her annual performance reviews between 2004 and 2008, Harris was rated as “excellent plus.” R. 66-2 (2004 Perf. Rev.) (Page ID # 1260); R. 60-14 (2006 Perf. Rev.) (Page ID #1135); R. 60-12 (2007 Perf. Rev.) (Page ID #1122); R. 60-13 (2008 Perf. Rev.) (Page ID # 1129). Her reviews included notations that she worked diligently with “minimal supervision” and possessed strong knowledge of the steel market. R. 60-14 (2006 Perf. Rev.) (Page ID # 1135); R. 60-12 (2007 Perf. Rev.) (Page ID # 1122). However, Harris’s supervisors also critiqued her interpersonal skills, not *637 ing that she could be disruptive and argumentative. R. 60-12 (2007 Perf. Rev.) (Page ID # 1122). Because 80% of buyers received the “excellent plus” rating, managers also assigned each employee a “contribution assessment,” but did not share this additional assessment with the employees. R. 60-2 (Gordon Decl. ¶ 13) (Page ID # 1034-35). In 2007 and 2008 Harris received the lowest contribution assessment level, placing her in the bottom quartile of employees in her peer group. Id. She also received low rankings on most of her job-related skills assessment areas in 2007 and 2008. R. 60-4 (Jirik Decl. ¶ 16) (Page ID # 1052-53).
Throughout her entire period of employment with Ford, Harris suffered from IBS, an illness that causes fecal incontinence. R. 67-3 (Harris Dep. at 139-40) (Page ID # 1384). Over time, her symptoms worsened and, on particularly bad days, Harris would be unable even to drive to work or stand up from her desk without soiling herself. Id. at 140 (Page ID # 1384); R. 60-6 (Harris Dep. at 144) (Page ID # 1060). Harris began to take intermittent FMLA leave when she experienced severe IBS symptoms. R. 66-3 (Harris Decl. ¶ 12) (Page ID # 1264).
After she began taking leave, Harris’s absences started to affect her job performance. In 2005, Dawn Gontko, Harris’s supervisor at that time, responded to Harris’s attendance problems by allowing her to work on a flex-time telecommuting schedule on a trial basis. Gontko deemed the trial unsuccessful because Harris “was unable to establish regular and consistent work hours.” R. 60-3 (Gontko Decl. ¶ 3) (Page ID # 1043). When Harris’s absences continued, Gontko placed her on Workplace Guidelines, a tool used by supervisors to assist employees in improving attendance. Id. ¶ 5 (Page ID # 1043-44). Jim Gordon, Gontko’s successor, also found Harris’s absences to be problematic. Although Ford did not approve remote work, Harris worked from home on an informal basis, including on evenings and weekends, to keep up with her work. However, Ford did not credit Harris with the time she spent working during non-“core” hours and marked the days that she stayed home because of her illness as absences. R. 60-2 (Gordon Decl. ¶ 8-9) (Page ID # 1029-30). Ford took the position that “if [Harris] was too ill to come to work, she would be considered too ill to work.” Id. ¶ 8 (Page ID #1029-30). Time spent working after core business hours was considered “casual overtime” expected of salaried employees. R. 60-6 (Harris Dep. at 237-38) (Page ID # 1071).
Ford also explained that work performed outside of core business hours is not a sufficient substitute for work during regular hours because employees cannot engage in team problem-solving or access suppliers to obtain information during off-hours. R. 60-2 (Gordon Decl. ¶ 7) (Page ID # 1029). Indeed, when Harris worked nights and weekends, she made mistakes and missed deadlines because she lacked access to suppliers. For example, while working on Saturday, April 18, 2009, Harris submitted a purchase order containing incorrect pricing information because she could not immediately access the supplier on a weekend to obtain updated quotations. R. 60-2 (Gordon Decl. ¶ 16) (Page ID # 1036-37). These mistakes added to the frustration of both suppliers and coworkers, who had to take time to correct them. Because Harris was not permitted to work remotely to mitigate the effect of her many unscheduled “absences,” Gordon was forced to shift some of her work to himself or Harris’s teammates. Id. ¶ 8 (Page ID # 1029-30); R. 60-8 (Pompey Decl. ¶ 4, 6) (Page ID # 1092-93). Under Ford’s system of marking absences, in the first seven months of 2009 Harris was *638 absent more often than she was present during core business hours. R. 60-2 (Gordon Decl. ¶ 10) (Page ID # 1030-33).
In February 2009, Harris formally requested that she be permitted to telecommute on an as-needed basis as an accommodation for her disability. R. 60-10 (Pray Email) (Page ID # 1100). Ford utilized a telecommuting policy that authorized employees to work up to four days per week from a telecommuting site. R. 60-11 (Telecommuting Policy) (Page ID # 1103). The policy provides that all salaried employees are eligible to apply for a telecommuting arrangement, but specifically states that such arrangements are not appropriate for “all jobs, employees, work environments or even managers.” Id. (Page ID # 1104). Under this policy, several other buyers telecommuted on one scheduled day per week. R. 66-21 (Coworkers’ Telework Agreements) (Page ID # 1362-63).
Harris believed that being permitted to work from home would relieve her stress and alleviate her IBS symptoms, and that any episodes would be less disruptive at home because they would not affect her coworkers. R. 60-6 (Harris Dep. at 146-48) (Page ID # 1061). In a meeting between Harris, Gordon, and human resources to discuss her telecommuting request, Harris maintained that most of her work could be done via computer or telephone. R. 66-10 (Meeting Notes) (Page ID # 1319-20). When Gordon raised a concern about Harris meeting with suppliers, she responded that she could reschedule meetings that fell at inconvenient times. Id. After this meeting, Harris’s supervisors discussed her job requirements and concluded that her position was not suitable to telecommuting. R. 60-2 (Gordon Decl. ¶ 11) (Page ID # 1034). Ford denied the request.
Instead, Karen Jirik, a Ford personnel relations representative, suggested several alternative accommodations, including moving Harris’s cubicle closer to the restroom or seeking another job within Ford more suitable for telecommuting. R. 60-4 (Jirik Decl. ¶ 9) (Page ID # 1049). Harris rejected each of these options. She also complained that Gordon had begun harassing her because of her leave-related absences. Id. ¶ 10. Jirik asked Harris to write a statement providing details regarding her complaint, but Harris never submitted a statement and Ford did not conduct an investigation. Id.
On April 23, 2009, Harris filed a charge of discrimination with the EEOC. R. 66-12 (EEOC Charge) (Page ID # 1330). A few weeks later, Gordon held a team meeting to discuss how best to allocate Harris’s workload when she had to be absent, but Harris became emotional and fled the room. R. 60-2 (Gordon Decl. ¶ 19) (Page ID # 1038). In July 2009, Gordon placed Harris on Workplace Guidelines. R. 60-4 (Jirik Decl. ¶ 3) (Page ID # 1046^17). Gordon also initiated a series of weekly meetings with Harris to discuss her performance. Harris felt threatened during these meetings because they were one-on-one, closed door sessions, during which Gordon used “military style yelling” and refused to allow her to leave the room. R. 60-6 (Harris Dep. at 218-19) (Page ID # 1066). In late July, Harris’s interim performance review categorized her as a “lower achiever”[1] and Gordon placed her *639 on a Performance Enhancement Plan (“PEP”). R. 60-16 (2009 Interim Perf. Rev.) (Page ID # 1141-42). The PEP was a tool designed to help employees improve performance by establishing concrete objectives that they could easily achieve within thirty days. R. 60-2 (Gordon Decl. ¶ 20) (Page ID # 1039). At the conclusion of the 30-day PEP period, Ford determined that Harris had failed to meet any of the identified objectives. Id. ¶¶ 22-25 (Page ID # 1039-40). A supervisory team held a meeting and decided to terminate her employment. Id. ¶ 26 (Page ID # 1040-41).
In 2011, the EEOC filed a complaint in the United States District Court for the Eastern District of Michigan, alleging that Ford violated the ADA by failing to accommodate Harris’s disability, 42 U.S.C. § 12112, and by retaliating against her for filing a charge with the EEOC, 42 U.S.C. § 12203. R. 9 (Am. Compl.) (Page ID # 24-28). Ford moved for summary judgment on both claims, R. 60 (Def. Mot. for Summ. J.) (Page ID # 991-1023), and the district court granted summary judgment in favor of Ford. R. 68 (D. Ct. Op.) (Page ID # 1390-1403).
The district court reasoned that the EEOC could not prevail on the failure-to-accommodate claim because Harris was not a “qualified” individual on the basis of her excessive absenteeism. Id. at 9-10 (Page ID # 1398-99). Furthermore, relying on precedent “deelinfing] to second-guess an employer’s business judgment regarding the essential functions of a job,” the district court found that Harris’s request to telecommute up to four days per week was not a reasonable accommodation for her position. Id. at 10 (Page ID # 1399). The district court additionally reasoned that the EEOC could not establish that Harris’s low performance reviews, placement on a PEP, and termination were retaliatory because those decisions were also based on performance deficiencies unrelated to the attendance issues arising from her IBS. Id. at 12-13 (Page ID # 1401-02). This timely appeal followed.
II. STANDARD OF REVIEW
We review de novo an order granting summary judgment. DiCarlo v. Potter, 358 F.3d 408, 414 (6th Cir.2004). A grant of summary judgment is appropriate “if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(a). In determining whether the district court’s grant of summary judgment was proper, “we must view all evidence in the light most favorable to the nonmoving party.” Kleiber v. Honda of Am. Mfg., Inc., 485 F.3d 862, 868 (6th Cir.2007) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).
III. FAILURE-TO-ACCOMMODATE CLAIM
The EEOC argues that Ford violated the ADA by refusing to provide a reasonable accommodation for Harris’s disability. Under the ADA, an employer may not “discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.” 42 U.S.C. § 12112(a). An employer “discriminates” under the ADA if it does not make “reasonable accommodations to the known physical or mental limitations of an otherwise qualified indi *640 vidual with a disability who is an applicant or an employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business.” Id. at § 12112(b)(5).
When a plaintiff premises a discrimination claim upon an employer’s failure to accommodate her disability, we analyze her claim under the following framework:
(1) The plaintiff bears the burden of establishing that he or she is disabled.
(2) The plaintiff bears the burden of establishing that he or she is “otherwise qualified” for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged “essential” job requirement eliminated; or (c) with a proposed reasonable accommodation. (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.
Kleiber, 485 F.3d at 869 (quoting Hedrick v. Western Reserve Care Sys., 355 F.3d 444, 452 (6th Cir.2004)); see also Hoskins v. Oakland Cnty. Sheriffs Dep’t, 227 F.3d 719, 724 (6th Cir.2000); Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1182-83 (6th Cir.1996), abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., 681 F.3d 312 (6th Cir.2012) (en banc).
Harris is indisputably disabled under the ADA: Her IBS is a physical impairment that substantially limits the operation of her bowel, a major bodily function. See 42 U.S.C. § 12102(1)(A), 12102(2)(B). The dispute in this case centers upon whether Harris was “otherwise qualified” for the resale steel buyer position. Harris has presented evidence to establish that she was qualified on two alternative bases: (a) she was qualified for the position after the elimination of the requirement that she be physically present at Ford facilities or (b) she was qualified for the position with a telecommuting accommodation. Because Harris has provided sufficient evidence to create a genuine dispute of material fact as to her qualification for the resale buyer position, the burden shifts to Ford to prove that either (a) the physical-presence requirement is an essential function of Harris’s job or (b) the telecommuting arrangement would create an undue hardship.
A. Qualification with “Essential” Job Requirement Eliminated
The EEOC offered evidence to demonstrate that, if the physical-presence requirement is eliminated, Harris is qualified for the resale-buyer position. Harris earned consistently positive performance reviews in the years leading up to her termination. R. 66-2 (2004 Perf. Rev.) (Page ID #1260); R. 60-14 (2006 Perf. Rev.) (Page ID #1135); R. 60-12 (2007 Perf. Rev.) (Page ID # 1122); R. 60-13 (2008 Perf. Rev.) (Page ID # 1129). Although she sometimes struggled with interpersonal relations, Harris’s supervisors praised her for her knowledge of the steel industry and her ability to work diligently without close supervision. R. 60-14 (2006 Perf. Rev.) (Page ID # 1135); R. 60-12 (2007 Perf. Rev.) (Page ID # 1122). Ford’s only serious criticism of Harris’s job performance related to her frequent absences during severe IBS flare-ups. R. 60-2 (Gordon Deck ¶¶ 8-10) (Page ID # 1029-33). Thus, leaving attendance issues aside, no record evidence indicates that Harris lacked the qualifications necessary to fulfill her role as a resale steel buyer.
Because the EEOC can demonstrate that Harris was qualified for her position if physical attendance at the worksite is not considered, the burden shifts to Ford *641 to prove that physical presence in the workplace is an “essential function” of the resale buyer position. Ford cannot indisputably carry its burden. For many positions, regular attendance at the work place is undoubtedly essential. See Brenneman v. MedCentral Health Sys., 366 F.3d 412, 418 (6th Cir.2004); Gantt v. Wilson Sporting Goods Co., 143 F.3d 1042, 1047 (6th Cir.1998). Indeed, the dissent cites a litany of cases that extol the sanctity of the attendance requirement. See, e.g., Samper v. Providence St. Vincent Med. Ctr., 675 F.3d 1233, 1235 (9th Cir.2012); Colón-Fontánez v. Municipality of San Juan, 660 F.3d 17, 33 (1st Cir.2011); Brenneman, 366 F.3d at 419; Gantt, 143 F.3d at 1047 (“An employee who cannot meet the attendance requirements of the job at issue cannot be considered a qualified individual protected by the ADA.”). What the dissent fails to recognize is that these cases focus on “predictable” and “regular” attendance in the workplace as an essential requirement of most jobs. The assumption implicit in the dissent’s analysis and many of the early cases is that the “workplace” is the physical worksite provided by the employer. When we first developed the principle that attendance is an essential requirement of most jobs, technology was such that the workplace and an employer’s briek-and-mortar location were synonymous. However, as technology has advanced in the intervening decades, and an ever-greater number of employers and employees utilize remote work arrangements, attendance at the workplace can no longer be assumed to mean attendance at the employer’s physical location. Instead, the law must respond to the advance of technology in the employment context, as it has in other areas of modern life,[2] and recognize that the “workplace” is anywhere that an employee can perform her job duties. Thus, the vital question in this case is not whether “attendance” was an essential job function for a resale buyer, but whether physical presence at the Ford facilities was truly essential. Determining whether physical presence is essential to a particular job is a “highly fact specific” question. Hoskins, 227 F.3d at 726. Accordingly, we consider several factors to guide our inquiry, including written job descriptions, the business judgment of the employer, the amount of time spent performing the function, and the work experience of past and present employees in the same or similar positions. See 29 C.F.R. § 1630.2(n)(2).
Ford argues that physical attendance at the Ford workplace was critical to the group dynamic of the resale-buyer team. Our sister circuits have recognized that physical presence at an employer’s facility may be an essential function for some positions specifically because they require extensive teamwork. See Samper, 675 F.3d at 1237 (“Sometimes [attendance] is required simply because the employee must work as ‘part of a team.’ Other jobs require face-to-face interaction with clients and other employees.” (internal citations omitted)); Mason v. Avaya Commc’ns, Inc., 357 F.3d 1114, 1122 (10th Cir.2004); Hypes v. First Commerce Corp., 134 F.3d 721, 727 (5th Cir.1998); Vande Zande v. *642 Wis. Dep’t of Admin., 44 F.3d 538, 544 (7th Cir.1995). Ford has provided evidence that teamwork was integral to the resale buyer position. One of Harris’s coworkers believed, based on her experience in the same position, that she could not perform effectively as a resale buyer while telecommuting. R. 60-8 (Pompey Deck ¶ 11) (Page ID # 1095). In addition, several members of Ford’s management team expressed their business judgment that physical attendance was essential for resale buyers because face-to-face interactions facilitate group problem-solving. R. 60-5 (King Dep. at 47-48) (Page ID #1057); R. 60-2 (Gordon Deck ¶11) (Page ID # 1033-34). However, as we have discussed, advancing technology has diminished the necessity of in-person contact to facilitate group conversations. The world has changed since the foundational opinions regarding physical presence in the workplace were issued: teleconferencing technologies that most people could not have conceived of in the 1990s are now commonplace. Indeed, Judge Posner presciently observed in Vande Zande that his conclusion that “team work under supervision generally cannot be performed at home without a substantial reduction in the quality of the employee’s performance” would “no doubt change as communications technology advances.” 44 F.3d at 544. Therefore, we are not persuaded that positions that require a great deal of teamwork are inherently unsuitable to telecommuting arrangements.
Moreover, our inquiry does not end simply because Ford has expressed the business judgment that face-to-face interaction is desirable. Courts routinely defer to the business judgment of employers because courts are not equipped with the institutional knowledge to sit as “super personnel department^].” See Mason, 357 F.3d at 1122 (internal quotation marks omitted). However, we should not abdicate our responsibility as a court to company personnel boards: While we do not allow plaintiffs to redefine the essential functions of their jobs based on their personal beliefs about job requirements, id., neither should we allow employers to redefine the essential functions of an employee’s position to serve their own interests. Rather, we should carefully consider all of the relevant factors, of which the employer’s business judgment is only one.
While Ford has provided substantial evidence of its business judgment and the experience of other resale buyers, the EEOC has also offered evidence that casts doubt on the importance of face-to-face interactions at Ford. Harris’s own experience over several years as a resale buyer indicates that in-person interaction may not be as important as Ford describes: Even when Harris was physically present at Ford facilities, “the vast majority of communications and interactions with both the internal and external stakeholders were done via conference calk” R. 66-3 (Harris Deck ¶ 3) (Page ID # 1262-63).[3] More fundamentally, Harris’s position is not one that actually requires face-to-face interactions with clients. Cf. Melange v. City of Ctr. Line, 482 Fed.Appx. 81, 84 *643 (6th Cir.2012) (concluding that a custodian must attend his physical workplace to complete the required manual labor); Samper, 675 F.3d at 1239 (concluding that “on-site” attendance was an essential function of the job for a neo-natal nurse who provided direct patient care); Brenneman, 366 F.3d at 420 (pharmacy technician); Nesser v. Trans World Airlines, Inc., 160 F.3d 442, 446 (8th Cir.1998) (airline customer-service agent). Although Harris needed to conduct occasional site visits with steel suppliers, R. 60-5 (King Dep. at 46) (Page ID # 1057), Ford has offered no evidence to prove that Harris would be less able to perform these site visits if she worked partially, or even primarily, from her home rather than Ford’s facilities.[4] Cf. Robert v. Bd. of Cnty. Comm’rs, 691 F.3d 1211, 1217 & n. 2 (10th Cir.2012) (concluding that working from home was not a reasonable accommodation for an employee who was completely unable to perform site visits at the time of her termination). As additional evidence that physical presence at Ford was not an essential function of the job, the EEOC points to Ford’s decision to extend telecommuting options to other resale buyers, albeit on a more limited basis than Harris’s initial request. R. 66-3 (Harris Decl. ¶ 22) (Page ID # 1265). Although Ford has provided significant evidence that physical attendance was an essential function of the resale buyer position, the EEOC has offered at least enough evidence genuinely to dispute this conclusion.
B. Qualification with Reasonable Accommodation
Alternatively, the EEOC can demonstrate that Harris was qualified for the resale buyer position with a reasonable accommodation for her disability, namely a telecommuting arrangement. We have previously concluded that telecommuting is not a reasonable accommodation for most jobs, but that there may be “unusual case[s]” when telecommuting is reasonable because the “employee can effectively perform all work-related duties at home.” Smith v. Ameritech, 129 F.3d 857, 867 (6th Cir.1997) (internal quotation marks omitted); see also Tyndall v. Nat’l Educ. Ctrs., Inc., 31 F.3d 209, 213 (4th Cir.1994). However, as we noted above, the class of cases in which an employee can fulfill all requirements of the job while working remotely has greatly expanded. The EEOC has presented sufficient evidence to create a genuine factual dispute as to whether *644 Harris is one of those employees who can effectively work from home.
Ford argues that a telecommuting arrangement is generally not a reasonable accommodation for resale buyers because they must interact on a regular basis with other team members and access information that is unavailable during non-“core” business hours. This argument confuses remote work arrangements with flex-time arrangements. Requests for flex-time schedules may be unreasonable because businesses cannot “operate effectively when [their] employees are essentially permitted to set their own work hours.” EEOC v. Yellow Freight Sys., Inc., 253 F.3d 943, 951 (7th Cir.2011) (en banc). Indeed, leave on a sporadic or unplanned basis may be an unreasonable accommodation. See Samper, 675 F.3d at 1240; Buckles v. First Data Res., Inc., 176 F.3d 1098, 1101 (8th Cir.1999) (finding the “[u]nfettered ability to leave work at any time” not to be a reasonable accommodation). However, telecommuting does not raise the same concerns as flex-time scheduling because an employer can still rely on an employee to be working during scheduled hours. Harris did not request to “simply miss work whenever she felt she needed to and apparently so long as she felt she needed to.” Samper, 675 F.3d at 1240. Instead she requested that she be able to work from home when she felt she needed to during normal business hours. See Waggoner v. Olin Corp., 169 F.3d 481, 485 (7th Cir.1999) (concluding that “[i]n some jobs ... working at home for a time might be an option” for a reasonable accommodation); Carr v. Reno, 23 F.3d 525, 530 (D.C.Cir.1994) (noting that “regular hours on a consistent basis” often remain a job requirement even when an employee is permitted to work from home). The arrangement Harris sought ensured that she would be available when needed to address an emergency or participate in an impromptu meeting. Ford’s concern with scheduling meetings and knowing who could be relied upon to handle urgent matters, R. 60-2 (Gordon Deck ¶ 7) (Page ID # 1029), did not depend on Harris’s physical presence in the office, but rather on her consistent availability during “core” hours.
Ford’s arguments based on specific performance problems that arose when Harris worked remotely also confuse telecommuting with flex-time arrangements. First, Ford asserts that Harris’s repeated absences forced managers to shift a portion of her responsibilities to her coworkers, which both increased other employees’ workloads and strained morale. R. 60-8 (Pompey Deck ¶ 4) (Page ID # 1092-93); R. 60-2 (Gordon Deck ¶ 8) (Page ID # 1029). A proposed accommodation that burdens other employees may be unreasonab0le, Brenneman, 366 F.3d at 420 (concluding that the medical leave a pharmacy technician requested as an accommodation for his disability was not reasonable because his absence “placed a great strain on the Pharmacy Department”), but the resale buyer position is not one that requires most of an absent employee’s work to be transferred to a coworker. For many jobs, an employee must be physically present at work to perform specific tasks; when the employee is not present, those duties must necessarily shift to the absent employee’s coworkers. See Samper, 675 F.3d at 1239-40 (neo-natal nurse); Brenneman, 366 F.3d at 420 (pharmacy technician); Nesser, 160 F.3d at 446 (airline customer service representative). Harris’s resale-buyer position differs because she does not need to interact in-person with equipment or people to perform the core functions of her job. Her coworkers were required to shoulder a portion of her work not because she was physically absent, but *645 because Ford prohibited her from working remotely during the business day.
Second, Ford argues that Harris made pricing mistakes while working remotely because she could not immediately contact a supplier for accurate information. As with the first problem, however, this mistake arose because Ford prohibited Harris from working remotely during core business hours, when she could telephone suppliers to request accurate pricing information. Her physical presence at Ford was irrelevant: Whether working from Ford’s facilities or from home, Harris would have called the supplier to obtain the necessary information. Ford has not provided any evidence that a telecommuting arrangement, as opposed to a flex-time arrangement, is inherently problematic.
Ford also argues that telecommuting is not a reasonable accommodation for Harris, compared to other resale buyers, because her request to telecommute for such a large portion of the work week was unreasonable and her previous attendance issues demonstrated she was not a suitable candidate for telecommuting. If Ford objected to Harris’s request to telecommute for “up to four days per week,” R. 60-10 (Pray Email) (Page ID # 1100), it was Ford’s responsibility to engage in an interactive process to explore reasonable alternatives. 29 C.F.R. § 1630.2(o )(3); Kleiber, 485 F.3d at 871. Harris was willing to discuss alternative accommodations, including a telecommuting arrangement for as few as one to two days per week. R. 66-3 (Harris Decl. ¶ 17) (Page ID # 1264). Ford’s failure to engage in that discussion is not evidence that a telecommuting arrangement in any form was unreasonable.[5] Cf. Rauen v. U.S. Tobacco Mfg. Ltd. P’ship, 319 F.3d 891, 896 (7th Cir.2003) (finding a requested accommodation unreasonable when “the only acceptable option to [the plaintiff] was ‘a home office in its entirety’ ”).
Second, Ford cannot use Harris’s past attendance issues as a basis to deny her accommodation because her absences were related to her disability. Humphrey v. Mem’l Hosps. Ass’n, 239 F.3d 1128, 1137 (9th Cir.2001). In Humphrey, a medical transcriptionist with obsessive compulsive disorder was consistently tardy because of ritualistic grooming behaviors in the morning. The employer denied her request for accommodation with a work-from-home arrangement, relying on its policy of not allowing such arrangements for employees with a disciplinary record. In holding that the employer was not entitled to summary judgment, the court explained that “[i]t would be inconsistent with the purposes of the ADA to permit an employer to deny an otherwise reasonable accommodation because of past disciplinary action taken due to the disability sought to be accommodated.” Id. at 1137. We find this reasoning persuasive. In the instant case, the EEOC has presented evidence that Harris’s past attendance issues were related to her IBS flare-ups. R. 60-6 (Harris Dep. at 141-46) (Page ID # 1060-61). Indeed, at times Harris would begin driving to work but be unable to complete her commute without losing control of her bowels. Id. at 144 (Page ID # 1060). Thus, Ford cannot rely on Harris’s past disability-related attendance issues to disqualify her from telecommuting.[6]
*646 Finally, Ford argues that even if Harris’s request for a telecommuting arrangement was reasonable, she is not “otherwise qualified” because she rejected alternative reasonable accommodations offered by Ford. See Hedrick, 355 F.3d at 457. When an employer “offers a reasonable counter accommodation, the employee cannot demand a different accommodation.” Jakubowski v. Christ Hosp., Inc., 627 F.3d 195, 203 (6th Cir.2010); see also Trepka v. Bd. of Educ., 28 Fed.Appx. 455, 459 (6th Cir.2002) (“The employer need not provide the accommodation that the employee requests or prefers. Instead the employer retains the ‘ultimate discretion’ to choose another effective accommodation.”). The alternative accommodation offered by an employer, however, must adequately address the employee’s unique needs and reasonably accommodate her disability.
Ford offered two alternative accommodations to Harris: (1) moving her cubicle closer to the restroom or (2) finding an alternate position within Ford more suitable to telecommuting. The EEOC has provided evidence that casts doubt on whether these alternatives address the problems Harris experienced with her IBS. For example, Harris testified that she might soil herself merely by standing up from her desk. R. 67-3 (Harris Dep. at 140) (Page ID # 1384). Clearly, moving Harris to a cubicle closer to the restroom does not address her needs if she has no control over her bowels for the time it would take to reach the restroom. Nor do we consider it reasonable, as the dissent suggests, to expect an employee to suffer the humiliation of soiling herself on a regular basis in front of her coworkers, merely because she could use Depends to contain the mess or bring a change of clothes to clean herself up after the fact. Likewise, Ford’s offer to assist Harris in finding an alternative position within Ford, R. 60-4 (Jirik Decl. ¶ 9) (Page ID # 1049), was not a reasonable accommodation because there was no guarantee that such a position would be forthcoming. Furthermore, “reassignment of an employee is only considered when accommodation within the individual’s current position would pose an undue hardship.” Cassidy v. Detroit Edison Co., 138 F.3d 629, 634 (6th Cir.1998). Thus, although the employer ordinarily has the option of choosing an accommodation from among reasonable options, Ford was not entitled to force Harris to accept an alternative position in this case because the telecommuting arrangement proposed by Harris was a reasonable means of accommodating her disability.
Because the EEOC has provided evidence that Harris was qualified for the resale-buyer position with a reasonable telecommuting accommodation, the burden shifts to Ford to prove that such an accommodation would pose an undue burden.[7] *647 It is not sufficient that an employer shows that it will be inconvenienced in some way by the proposed accommodation: “We may assume that any accommodation would entail some hardship on the Company, but ... undue hardship is something greater than hardship, and an employer does not sustain his burden of proof merely by showing that an accommodation would be bothersome to administer or disruptive of the operating routine.” Draper v. U.S. Pipe & Foundry Co., 527 F.2d 515, 520 (6th Cir.1975) (internal quotation marks omitted). The ADA directs us to consider several factors when determining whether an accommodation imposes an undue hardship on an employer: (1) “the nature and cost of the accommodation,” (2) the financial and personnel resources of the affected facility, (3) the resources of the employer as an entity, and (4) the structure and functions of the employer’s workforce. 42 U.S.C. § 12111(10)(B). Although setting up a home workstation for Harris might entail some cost, considering Ford’s financial resources and the size of its workforce, this cost is likely to be de minimis. Indeed, Ford has created a written policy in which it pledges to absorb these costs for all employees approved to telecommute. R. 60-11 (Telecommuting Policy at 5-6) (Page ID # 1106-07). Therefore, Ford has not met its burden of proving that a telecommuting accommodation, even if reasonable, would create an undue hardship.
The EEOC has provided evidence that Harris is “otherwise qualified” for the resale-buyer position, either because her physical presence is not “essential” or because she requested a reasonable accommodation for her disability. It is important, at this juncture, to clarify that we are not rejecting the long line of precedent recognizing predictable attendance as an essential function of most jobs. Nor are we claiming that, because technology has advanced, most modern jobs are amenable to remote work arrangements. As we discussed above, many jobs continue to require physical presence because the employee must interact directly with people or objects at the worksite. See, e.g., Melange, 482 Fed.Appx. at 84 (custodian). We are merely recognizing that, given the state of modern technology, it is no longer the case that jobs suitable for telecommuting are “extraordinary” or “unusual.” Vande Zande, 44 F.3d at 545; Smith, 129 F.3d at 867-68. When we decided Smith in 1997, we responded to the world as it then existed; however, in the intervening years, communications technology has advanced to the point that it is no longer an “unusual case where an employee can effectively perform all work-related duties from home.” Smith, 129 F.3d at 867-68. In this case, we respond to the world as it exists now, and conclude that there is a genuine dispute of material fact regarding whether Harris can perform all of her job duties from a remote location. Accordingly, we reverse the district court’s grant of summary judgment on the failure-to-accommodate claim.
IV. ADA RETALIATION CLAIM
The EEOC argues that Harris began receiving negative reviews and was ultimately terminated in retaliation for filing an EEOC charge based on Ford’s failure to accommodate her disability. The ADA prohibits discrimination “against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a *648 charge ... under [the ADA].” 42 U.S.C. § 12203(a). A plaintiff may prove retaliation claims using the McDonnell Douglas burden-shifting framework: The plaintiff bears the initial burden of proving a prima face case, then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions, and finally the burden shifts back to the plaintiff to prove that the defendant’s proffered reason is pretext for discrimination. See Penny v. United Parcel Serv., 128 F.3d 408, 417 (6th Cir.1997).
To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action. Harris’s EEOC charge filed on April 23, 2009 was “protected activity,” see 42 U.S.C. § 12203(a), and her subsequent poor performance reviews and termination were adverse employment actions. The EEOC has also provided evidence of a causal connection between the EEOC charge and Harris’s poor reviews and termination. Because approximately four months passed between the EEOC charge and Harris’s termination, temporal proximity alone does not establish causation in this case. See Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir.2008) (reasoning that temporal proximity alone was sufficient to establish causation when an employer terminated an employee on the same day that he learned of the employee’s EEOC complaint). However, a plaintiff can prove causation when she can “couple temporal proximity with any ... other evidence of retaliation.” Id. at 525. A relatively short period of time elapsed between Harris’s EEOC charge in late April and her ultimate termination in early September, and the EEOC has presented evidence that other retaliatory conduct also occurred during this period. For example, after Harris filed her EEOC charge, her immediate supervisor began conducting intimidating one-on-one meetings with her and held a meeting with all of her coworkers to discuss her attendance problems. R. 60-6 (Harris Dep. at 218-24) (Page ID # 1066-67); R. 60-2 (Gordon Deck ¶ 19) (Page ID # 1038). Harris also began receiving negative performance reviews for the first time after she filed her EEOC charge. R. 60-16 (2009 Interim Perf. Rev.) (Page ID # 1140-42). Taken together, the examples of negative treatment from Ford supervisors along with the close temporal proximity between the EEOC charge and Harris’s termination, are sufficient evidence to create a genuine dispute as to the existence of a causal connection.
Ford responds to Harris’s prima facie case of retaliation by asserting that its decision to place her on a PEP and terminate her were legitimate and nondiscriminatory business decisions made in response to her negative performance reviews. Although Harris was under the impression that her performance was strong enough to earn an “excellent plus” evaluation, Ford consistently rated Harris as falling within the bottom quartile of her peer group. R. 60-2 (Gordon Deck ¶ 13) (Page ID # 1034-35). Harris’s performance reviews and testimony from her supervisors demonstrate that she struggled with several important metrics of job performance, including interpersonal relations, keeping current on paperwork, and completing accurate purchase orders. Id. ¶¶ 13-25 (Page ID # 1034-40). Furthermore, after Harris was placed on a PEP, she failed to achieve any of the objectives identified in the plan. Id. ¶¶ 20-25 (Page ID # 1039-40). These critical failings provided a legitimate basis upon which Ford could have decided to take disciplinary action against Harris and, after she *649 failed to improve, terminate her employment.
Thus, the burden shifts back to the EEOC to prove that Ford’s proffered reason for terminating Harris is pretext for discrimination. Once a plaintiff has established a prima facie case, summary judgment is ordinarily inappropriate because the question of pretext centers on a factual inquiry: “[I]n discrimination and retaliation cases, an employer’s true motivations are particularly difficult to ascertain, thereby frequently making such factual determinations unsuitable for disposition at the summary judgment stage.” Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 564 (6th Cir.2004) (citing U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)). A plaintiff can show that an employer’s purported reason for taking an adverse employment action is pretextual if it (1) “had no basis in fact,” (2) “did not actually motivate the employer’s action,” or (3) was “insufficient to motivate the employer’s action.” Chen v. Dow Chem. Co., 580 F.3d 394, 400 (6th Cir.2009).
When viewed in a light favorable to Harris, the evidence suggests that Harris’s performance failings did not actually motivate Ford’s decisions to discipline her and terminate her employment. Although many of Harris’s performance deficiencies were ongoing problems, they prompted a negative review only after Harris filed her EEOC charge. Compare R. 60-14 (2006 Perf. Rev.) (Page ID # 1130-35); R. 60-12 (2007 Perf. Rev.) (Page ID # 1117-22); R. 60-13 (2008 Perf. Rev.) (Page ID # 1123-29) with R. 60-16 (2009 Interim Perf. Rev.) (Page ID # 1140-42). In addition, a reasonable jury could infer that the PEP was designed to set Harris up to fail: One of Harris’s PEP goals was to eliminate a backlog of paperwork, id. ¶ 22 (Page ID # 1039), but Harris testified that the paperwork was pending only because she needed to wait on responses from suppliers and coworkers.[8] R. 60-6 (Harris Dep. at 264) (Page ID # 1077). Viewed in a light favorable to Harris, this evidence creates a genuine dispute as to whether Ford was truly motivated by retaliatory intent or by a reasoned business decision to terminate an underperforming employee. The EEOC has presented evidence on which a reasonable jury could conclude that Ford retaliated against Harris for filing a charge of discrimination with the EEOC. Therefore, we reverse the district court’s grant of summary judgment.
V. CONCLUSION
For the foregoing reasons, we REVERSE the district court’s grant of summary judgment to Ford and REMAND for further proceedings consistent with this opinion.

. In 2009 Ford changed its performance rankings, jettisoning the "excellent plus” rating and using a new rubric ranging from “Top Achiever” to "Unsatisfactory.” The "Lower Achiever” ranking falls just above "Unsatisfactory.” Harris noted on the bottom of the review: "This review represents retaliatory harassment behavior on the part of my supervisor, John Gordon, due to my filing a charge of Disability Discrimination with the *639 EEOC.” R. 60-16 (2009 Interim Perf. Rev.) (Page ID #1140).

. The Justices of the Supreme Court have recognized the law’s evolution in response to advancing technology in a number of different contexts. See, e.g., United States v. Jones, - U.S. -, 132 S.Ct. 945, 955, 957, 181 L.Ed.2d 911 (2012) (Sotomayor, J., concurring) (Alito, J., dissenting) (five members of the court expressing concern that Fourth Amendment search and seizure law must adapt to novel modes of electronic surveillance); Ashcroft v. Free Speech Coal., 535 U.S. 234, 259, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002) (Thomas, J., concurring) (reasoning that child pornography law must adapt to more sophisticated technology that produces "virtual” child pornography).

. The dissent characterizes Harris’s testimony on this point as "self-serving” and dismisses it out of hand, noting that any employee could provide testimony to show that her job was suitable to telecommuting. But the dissent fails to recognize that an employer can just as easily provide self-serving testimony that even marginal job functions are absolutely essential. It is not our role at the summary judgment stage to assess whether testimony is believable; such credibility contests are for the trier of fact to resolve. When reviewing a motion for summary judgment, we must accept all facts and draw all reasonable inferences in favor of the nonmovant. Thus, we accept as true Harris's testimony that she regularly attended meetings via teleconference even while at Ford facilities.

. The EEOC argues that these occasional site visits do not disqualify Harris from employment as a resale buyer because she would be able to reschedule site visits if they fell on a day in which she experienced severe IBS symptoms. Ford counters that frequent rescheduling is not an acceptable solution because it would disrupt business and strain client relationships. Contrary to the dissent’s characterization, there is no evidence in the record that Harris "was forced to routinely cancel [site visits] at the last minute”; rather, the record indicates that Harris anticipated rescheduling visits if they were ever to coincide with a day on which she was experiencing a flare-up. There is no evidence that such a problem would necessarily arise, much less that it would occur "routinely.” The factual dispute regarding whether there is a reasonable solution to Harris's potential difficulty performing site visits should be resolved by a factfinder. See Crider v. Univ. of Term., Knoxville, 492 Fed.Appx. 609, 615 (6th Cir.2012) (finding summary judgment inappropriate when an employer had not shown that there was no possible accommodation for an employee who could not conduct site visits on some days for religious reasons, in part because there was no evidence that such visits would be scheduled on those days). Regardless, the requirement that resale buyers conduct site visits has no effect on whether physical attendance is an essential function of the position: A site visit requires the resale buyer to leave the location where she ordinarily works, whether it be a Ford facility or the employee's home.

. As we discuss below, Ford did offer several alternatives, but none were indisputably reasonable means of accommodating Harris's disability. R. 60-4 (Jirik Decl. ¶ 9) (Page ID # 1049).

. Ford also claims that Harris is not a suitable candidate for telecommuting because she was "unable to establish regular and consistent work hours” during an earlier alternative work arrangement. R. 60-3 (Gontko Decl. ¶ 3) (Page ID # 1043). However, the earlier *646 trial was based on a "flex-time” arrangement, in which Harris was permitted to work during non-"core” business hours. As discussed above, the availability and consistency problems inherent in flex-time arrangements are not necessarily present in telecommuting arrangements because the employee can maintain a standard work schedule. Therefore, Harris’s unsuccessful experiment with an alternative work arrangement in the past does not doom to failure the telecommuting arrangement she requested as an accommodation.

. Our explanation of why Harris’s proposed accommodation is reasonable also explains why such an accommodation would not impose an undue hardship on Ford: “In a case-specific context, the terms are virtually mutually exclusive in the sense that 'undue hardship’ defines which accommodations an employer will be required to adopt. If an employer shows that a proposed accommodation imposes an undue hardship, then it would be ‘unreasonable’ to require this employer to adopt that accommodation, regardless whether another employer, in a different *647 factual context, may be required to adopt that same accommodation.” Monette, 90 F.3d at 1183 n. 10.

. The dissent challenges our conclusion that a reasonable jury could conclude that the PEP set Harris up to fail by noting that the paperwork tasks designated in the PEP "were important duties of the resale buyer position.” That is true, but the question is not whether the duties identified in the PEP were integral to the position; rather, the question is whether the duties were achievable within the 30-day window provided for in the PEP. On review of a motion for summary judgment, we accept as true Harris’s testimony that she was unable to complete her paperwork because she needed information from coworkers and suppliers that was not forthcoming. Therefore, drawing all reasonable inferences in Harris's favor, a reasonable jury could conclude that the PEP was designed in a way that prevented her from being successful.