KAREN NELSON MOORE, Circuit Judge,
dissenting.
This case concerns one person, Jane Harris, her job as a resale buyer at one Ford work-site, and the particularly difficult challenges she faces as a result of her medical condition of irritable bowel syndrome (“IBS”). She argues that Ford failed reasonably to accommodate her disability when it refused her request to telework some days each week. At this moment, this case is not even about whether Harris should prevail against Ford. The question is simply whether she has presented enough evidence to create a genuine dispute of material fact such that summary judgment for Ford is not proper.
The key issue is whether Harris is a qualified individual to bring a discrimination claim under the ADA. 42 U.S.C. § 12111(8); id. § 12112(a). In this case, this requires showing that either physical presence at the work-site is not an essential function of Harris’s job as a' resale buyer, or relatedly, that telework is a reasonable accommodation for Harris. The ADA and the EEOC regulations implementing the statute provide courts with a non-exhaustive list of seven factors to help guide our consideration of these issues. 29 C.F.R. § 1630.2(n)(3). But the overarching focus of those regulations is that “[w]hether a particular function is essential is a factual determination that must be made on a case by case basis.” 29 C.F.R. § 1630, app. § 1630.2(n). And because this case is an appeal from a grant of summary judgment, this intensive factual determination must be undertaken while “viewing] all evidence in the light most favorable” to Harris. Kleiber v. Honda of Am. Mfg., Inc., 485 F.3d 862, 868 (6th Cir.2007).
*771 I dissent because the majority refuses to engage in the fact-intensive, case-by-case determination required by the EEOC regulations and repeatedly refuses to take the facts in the light most favorable to Harris, as summary judgment requires. When we apply both standards properly, the EEOC has presented sufficient evidence to dispute whether Harris is a qualified individual, either because physical presence is not an essential function of her job or because telework is a reasonable accommodation for her. There is also a genuine dispute about whether Ford retaliated against Harris for filing a charge with the EEOC.
I. ANALYSIS
A. Harris’s request to telework
It is crucial to begin with what Harris actually requested. Harris first requested telework in an email to HR, stating that “[p]er my disability and Ford’s Telecommuting'policy, I am asking Ford to Accommodate my disability by allowing me to work up to four days per week from home.” R. 60-10 (Harris Email to Pray) (Page ID # 1100). A comparison to Ford’s telecommuting policy makes clear that Harris’s initial request drew directly from the language of that policy, which allowed for “one to four days” of telework each week. R. 60-11 (Telecommuting Policy at 2) (Page ID # 1103) (“[A]n employee may work one to four days from the Telecommuting/alternate work site.” (emphasis added)). Ford met with Harris two times to discuss her request, on April 6 and April 15, 2009. R. 66-10 (Mtg. Notes) (Page ID # 1318-1324). In the first meeting on April 6, Harris explicitly told Ford that her request was based on the policy language and that she was not asking to telework four days per week, every week. R. 66-10 (Mtg. Notes at 3) (Page ID # 1320) (“[Harris] said she is not envisioning that she would need to telecommute 4 days per week. When she was talking about it previously, she was just stating what the policy allowed for — up to 4 days per week.”). Ford began the second meeting on April 15 by telling Harris that she could not telecommute. R. 66-10 (Mtg. Notes at 4) (Page ID # 1321). Therefore, as discussed more fully below, Ford cut off Harris’s request without attempting to clarify the specific details of what she was seeking.
The key point is that Harris proposed to be out of the office up to four days each week, not four days per week, every week. The relevant questions in this case are therefore whether physical presence every day of the week is an essential function of Harris’s job, and whether telework some days each week is a reasonable accommodation.
B. The EEOC created a genuine dispute of material fact whether physical presence at the work-site is an essential function of Harris’s job.
I agree that we should consider Ford’s judgment that physical presence in the office is an essential function of Harris’s job. However, Ford gave only one reason for why physical presence is an essential function — that the resale buyer position requires a great deal of face-to-face teamwork. Ford did not and could not argue that Harris needed to be in the office to use key equipment or to provide services to outside clients, for example. What exactly is the teamwork that Ford claims must be performed face-to-face? Based on the limited record of this case, it appears to be two things: (1) spur-of-the-moment meetings to address unexpected problems in the supply chain, and (2) scheduled meetings. Appellee Supp. En Banc Br. at 9-10.
In contrast, the EEOC presented two pieces of evidence that directly contradict *772 Ford’s claim that the teamwork functions of Harris’s job required her to be physically present in the office. First, Harris attested in her declaration that she actually performed 95% of her job on the phone or through email, even when in the office. Second, Ford allowed other resale buyers to telework. This suggests that, to perform effectively, resale buyers do not need to be prepared to handle unexpected problems in the supply chain through face-to-face interactions every day of the week.
A reasonable jury might ultimately agree with Ford, or it might agree with Harris. The point is that there is a genuine dispute of material fact that only a jury should resolve.
1. Harris’s declaration
Harris’s sworn declaration directly contradicts Ford’s insistence that the teamwork required of resale buyers — both spur of the moment trouble-shooting and scheduled meetings — is actually done face-to-face. Harris attested that she performed 95% of her job duties electronically (on the computer or telephone), even when in the office. R. 66-3 (Harris Decl. ¶ 10) (Page ID # 1263) (“Approximately 70% percent [sic] of the work I did as a Buyer was done on a computer. Approximately 25% of the work I did as a Buyer was done on the telephone.”). Harris added that “the vast majority of communications and interactions with both the internal and external stakeholders were done via a conference calk” Id. ¶ 3 (Page ID # 1262). She further declared that she “frequently communicated with [her] co-workers via email even though both [she] and [her] co-workers were in the office,” and that she “also frequently communicated with suppliers via email and telephone.” Id. ¶¶ 5-6 (Page ID # 1263). Harris attested that scheduled teamwork, like meetings, did not always occur face-to-face. She stated that Ford had “telephone conference call capabilities which would allow employees to engage in a meeting without actually having all the meeting stakeholders present in the same room,” and that “all internal meetings included the conference call attendance option.” Id. ¶¶ 7, 9 (Page ID # 1263) (emphasis added).
The majority dismisses Harris’s testimony because she does not say she could perform all of her duties “as effectively off-site.” Maj. Op. at 764. But that focus certainly is not taking the evidence in the light most favorable to Harris, as the summary-judgment standard commands. Instead, the majority is actively looking for ways to read omissions — not even actual statements — in her testimony in the light least favorable to her.
Although Harris agreed when she first met with her supervisor that four of her ten to eleven job responsibilities could be done only at Ford, a closer look at the record reveals that she disputed that the tasks arose every day or that they could not be postponed until she was next in the office, which would be at least some days each week. R. 66-10 (Mtg. Notes at 2) (Page ID # 1319).[1] At least one of those four responsibilities — supplier site visits— does not advance Ford’s argument that physical attendance at the Ford work site *773 is an essential function of Harris’s job because Harris would have to travel to make those visits; whether she leaves from the office or from home should not matter.[2] Nor is there any indication in the record whether all four tasks are themselves properly considered essential functions of the resale buyer job. For example, we do not know “[t]he amount of time spent on the job performing [these] functions,” one factor mentioned in the EEOC regulations. 29 C.F.R. § 1630.2(n)(3)(iii).
We can consider Harris’s own experience on the job. The EEOC regulations make explicit that we can consider relevant evidence to define the essential functions of a job, even if the evidence is not explicitly articulated in the regulations. 29 C.F.R. § 1630.2(n)(3) (stating that “[e]vidence of whether a particular function is essential includes, but is not limited to ” the seven listed factors) (emphasis added); see also 29 C.F.R. § 1630, app. § 1630.2(n) (“[T]he list [of factors included in § 1630.2(n)(3) ] is not exhaustive.”) (emphasis added). The appendix continues that “other relevant evidence may also be presented. Greater weight will not be granted to the types of evidence included on the list than to the types of evidence not listed.” 29 C.F.R. § 1630, app. § 1630.2(n) (emphasis added). As in any case, testimony from the plaintiff can be sufficient to preclude summary judgment, provided that it creates a genuine dispute of material fact.
Giving weight to Harris’s testimony in this case will not mean that “every failure-to-accommodate claim involving essential functions would go to trial.” Maj. Op. at 764. Take the issue of whether physical presence at the worksite is an essential function. Some jobs clearly require an employee to be in the office — for example, an employee who works in a factory and must use large immobile equipment that is located only on-site. Testimony from that employee that he or she could nevertheless work from home on that immobile equipment will not create a genuine dispute of material fact precluding summary judgment.
What appears to be driving the majority’s unwillingness to give any weight to Harris’s own testimony is an unstated belief that employee testimony is somehow inherently less credible than testimony from an employer. Employers, just as much as employees, can give testimony about whether a particular function is essential that is “self-serving” or not grounded in reality. Our role is not to assess who is more credible. Rather, at the summary-judgment stage, we must take the evidence in the light most favorable to the nonmovant. As we recently explained, “[i]f an employer’s judgment about what qualifies as an essential task were conclusive, an employer that did not wish to be inconvenienced by making a reasonable accommodation could, simply by asserting that the function is essential, avoid the clear congressional mandate that employers mak[e] reasonable accommodations.” Rorrer v. *774 City of Stow, 743 F.3d 1025, 1039 (6th Cir.2014) (internal quotation marks omitted) (second alteration in original).
2. Telework agreements of other resale buyers
The EEOC did not present just Harris’s own declaration. The EEOC also argued that the fact that Ford allowed other resale buyers to telecommute helped to create a genuine dispute of material fact. Yes, other resale buyers did not telework in exactly the same manner that Harris initially proposed. They had been approved to telecommute on one to two set days per week. R. 66-21 (Telecommuting Agreements) (Page ID # 1361-63); R. 60-22 (Telecommuting Agreement) (Page ID # 1173); R. 66-20 (Ford Resp. to Interrogs. at 2-3) (Page ID # 1359-60) (“Ford ... has identified the following GSR buyers within the department where Ms. Harris worked ... who participated in telecommuting arrangements in 2009: ... Joan Mansucti (2 days per week in agreement but telecommuted 1 day per week).” (emphasis added)). Karen Jirik from HR characterized the telework agreements of other resale buyers as including a requirement that “an employee with an approved telecommuting arrangement should be prepared to come into the office on telecommute days when the business or management requires it.” R. 60-4 (Jirik Decl. ¶ 7) (Page ID # 1048).
The gulf between Harris’s request and the telecommuting arrangements of other resale buyers, however, is not so wide or clear as the majority claims it is. The majority’s unsupported assertion to the contrary, there is no evidence in the record that Ford ever explicitly offered Harris a similar teleworking agreement — a set schedule of days plus a commitment to come into the office if necessary. R. 66-10 (Mtg. Notes) (Page ID # 1318-24). Gordon did describe the telework agreements of the resale buyers as an example of “under what circumstances he felt telecommuting would work for” a resale buyer. Id. at 6 (Page ID # 1323). However, Gordon did so at the end of Ford’s second meeting with Harris. Id. Ford opened that meeting by telling Harris that her telework request had been denied, so it is hard to see how Gordon’s discussion could in any way be construed as an offer for Harris to telecommute in a similar fashion. Id. at 4 (Page ID # 1321). Although Jirik claimed that the other resale buyers had agreed to come into the office if necessary, that requirement does not appear in Ford’s telecommuting policy or in the telecommuting agreements of other resale buyers. R. 60-11 (Telecommuting Policy) (Page ID # 1102-16); R. 66-21 (Telecommuting Agreements) (Page ID # 1361-63); R. 60-22 (Telecommuting Agreement) (Page ID # 1173). Even if actually enforced, there is no record evidence indicating that Harris would not have also agreed to come into the office if a work matter required it. And again, Harris did not request to telework four days per week, every week.
Even accepting the differences from Harris’s initial request, the telecommuting arrangements of other resale buyers undercut Ford’s claim that, at any given moment, resale buyers must engage in spur of the moment, face-to-face trouble-shooting in order to perform their jobs effectively. By definition, unexpected problems might arise when a resale buyer is telecommuting, and he or she therefore could not participate in face-to-face, spur-of-the-moment meetings to address those problems. Yet Ford still determined that those resale buyers could effectively perform the teamwork functions of their jobs while being absent from the office one to two days per week. The potential difference in predictability in when Harris *775 would be in the office more clearly implicates scheduled teamwork, like meetings. Again, however, Harris attested that “all internal meetings included the conference call attendance option.” R. 66-3 (Harris Deck ¶¶ 7, 9) (Page ID # 1263) (emphasis added).
3. Ford’s own judgment
Ford’s own judgment that physical presence in the office is an essential function of Harris’s job certainly is entitled to consideration, but that judgment is not dispositive. In defining “[qjualified individual,” the ADA states only that “consideration shall be given to the employer’s judgment as to what functions of a job are essential.” 42 U.S.C. § 12111(8) (emphasis added). Noticeably absent is the word “deference.” See Rorrer, 743 F.3d at 1042. The EEOC regulations interpreting this section similarly include the employer’s judgment as just one of seven factors courts should consider. 29 C.F.R. § 1630.2(n)(3). Yes, the EEOC regulations provide that “inquiry into the essential functions is not intended to second guess an employer’s business judgment with regard to production standards,” but they also state that “whether a particular function is essential ‘is a factual determination that must be made on a case by case basis [based upon] all relevant evidence.’ ” Deane v. Pocono Med. Ctr., 142 F.3d 138, 148 (3d Cir.1998) (quoting 29 C.F.R. § 1630, app. § 1630.2(h)) (alterations in original). Other circuits also treat the employer’s judgment as just one factor to consider in assessing whether a particular function is essential. See, e.g., Rohan v. Networks Presentations LLC, 375 F.3d 266, 279 n. 22 (4th Cir.2004); Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 25 (1st Cir. 2002); Cripe v. City of San Jose, 261 F.3d 877, 887 (9th Cir.2001).
The majority’s test for when an employer’s judgment that a function is essential can be overcome — if it is not “job-related, uniformly-enforced, [or] consistent with business necessity,” Maj. Op. at 766 — is thus not compelled by the ADA or the EEOC regulations. And in fact, the majority’s test is in direct tension with the regulations’ insistence that the inquiry is a fact-intensive, case-by-case determination.
Moreover, the majority’s insistence that the “general rule” is that physical attendance at the worksite is an essential function of most jobs does not advance the analysis in this case. In many of the cases cited by Ford for this proposition, the courts actually held that regular attendance is an essential function, while-assuming (without deciding) that that regular attendance must be at the physical work-site. See, e.g., Vandenbroek v. PSEG Power CT LLC, 356 Fed.Appx. 457, 460 (2d Cir.2009); Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P., 444 F.3d 961, 966 (8th Cir.2006); Gantt v. Wilson Sporting Goods Co., 143 F.3d 1042, 1047 (6th Cir.1998). When courts have addressed the issue, the record had, in fact, established that the employee had to be physically present to access equipment or materials located only in the office, or to provide direct services to clients or customers. See, e.g., Samper v. Providence St. Vincent Med. Ctr., 675 F.3d 1233, 1238-39 (9th Cir.2012) (neo-natal nurse who provided direct patient care); E.E.O.C. v. Yellow Freight Sys., Inc., 253 F.3d 943, 949 (7th Cir.2001) (forklift operator); Hypes v. First Commerce Corp., 134 F.3d 721, 726 (5th Cir.1998) (loan review analyst who used confidential documents that could not leave the office); Tyndall v. Nat’l Educ. Ctrs., Inc. of Cal., 31 F.3d 209, 213 (4th Cir.1994) (teacher).
Here, in contrast, the sole reason given by Ford for why Harris needs to be physi *776 cally present in the workplace is that the resale buyer position requires a high degree of face-to-face teamwork. Ford does not claim that necessary physical equipment or files can be accessed only on-site, or that Harris must interact with outside clients at Ford’s work-site.
Nor do cases noting teamwork as one reason for finding physical presence an essential job function resolve this ease. Of the cases cited by Ford, all but two involved jobs that otherwise obviously require physical attendance — materials located only in the office or direct client interaction. The courts therefore did not need to consider squarely whether teamwork might be effectively accomplished remotely because other aspects of the employees’ jobs clearly required them to be physically present at work. See, e.g., Samper, 675 F.3d at 1238 (neo-natal nurse who provided direct patient care); Hypes, 134 F.3d at 726 (loan review analyst who used confidential documents that could not leave the office). And in one of the two remaining cases, the employee did not actually contest that her teamwork responsibilities could be performed only on-site; rather, she argued that another employee could take up the in-person teamwork duties of her job. Mason v. Avaya Commc’ns, Inc., 357 F.3d 1114, 1120-21 (10th Cir.2004) (noting that the employee testified that “one of the other fourteen service coordinators in her group can perform the ‘teaming’ duties, such as covering for a co-employee on break”).
Therefore, only the Seventh Circuit’s decision in Vande Zande v. Wisconsin Department of Administration, 44 F.3d 538 (7th Cir.1995), arguably presents a set of facts similar to the present case. In Vande Zande, the plaintiff had a job that did not require her to use materials present only in the workplace or to interact directly with clients on-site.[3] The Vande Zande court specifically stated that its conclusion that “team work under supervision generally cannot be performed at home” would “no doubt change as communications technology advances.” Id. at 544. Technology has undoubtedly advanced since 1995 in facilitating teamwork through fast and effective electronic communication such that it should no longer be assumed that teamwork must be done in-person.
Thus, neither the general case law on physical presence at the work-site nor pri- or case law on teamwork resolves this case. Ford gave only one reason for why Harris’s physical presence at the worksite is an essential function of her job — that the resale buyer position requires a great deal of face-to-face teamwork. The EEOC presented two pieces of evidence that directly contradict this claim. Summary judgment is therefore not appropriate.
Finally, the majority’s claim that failure to grant summary judgment to Ford would turn telework into a “weapon” completely overstates the reach of this case and itself sets a problematic precedent for other failure-to-accommodate cases. First, providing telework is not just a good deed; sometimes it is legally required under the ADA. Second, in any given case, employees seeking telework as a reasonable accommodation partly on the basis that other employees are permitted to telework would need to show that those other employees have similar job duties to their own. They cannot point to just any employee. Here, Harris pointed to telework agreements of other resale buyers. More *777 fundamentally, in assessing whether a function is essential, the EEOC regulations expressly invite courts to consider the experience of other employees “in similar jobs.” 29 C.F.R. § 1630.2(n)(3)(vii). Indeed, the majority’s test for whether a function is essential also requires assessing how the employer treats other employees. Thus, this kind of comparison is inevitable in order to evaluate properly many reasonable-accommodation claims. The majority would privilege Ford’s overstated perverse-incentives argument at the expense of properly and carefully assessing reasonable-accommodation claims as the ADA and the EEOC regulations require. Finally, I doubt that Ford and other employers would actually limit telework so drastically based on the slight risk that in certain reasonable-accommodation cases, the telework agreements of employees with similar job duties might be relevant. The majority ignores the myriad other reasons why employers might choose to provide telework to their employees, such as incentivizing individuals to come work for them or reducing the size of the physical workplace.
C. The EEOC created a genuine dispute of material fact whether telework is a reasonable accommodation for Harris.
Alternatively, there is a genuine dispute of material fact whether Harris was qualified with the reasonable accommodation of telework. Many of Ford’s arguments that telework would not be a reasonable accommodation for Harris confuse flex-time arrangements — when an employee might work after regular business hours or on the weekends — with tplework during core business hours only — when Ford’s offices are open. Harris’s request can be construed as a request to telework during core business hours only.[4] If Harris teleworked during core business hours only, Ford’s concerns that she could not access pricing information from other Ford employees or be available to interact with team members would not arise.
That Harris had attendance issues does not make her request to telework unreasonable. Harris missed work because of her disability. As the Ninth Circuit has held, “[i]t would be inconsistent with the purposes of the ADA to permit an employer to deny an otherwise reasonable accommodation because of past disciplinary action taken due to the disability sought to be accommodated.” Humphrey v. Mem’l Hosps. Ass’n, 239 F.3d 1128, 1137 (9th Cir.2001). Moreover, Ford did not meet its burden to show that allowing Harris to telework would be an undue hardship.
Harris’s prior experiments with telework do not compel the conclusion that the telework arrangement she requested in this case was unreasonable. The majority again refuses to take the posture that summary judgment requires, and instead reads factual disputes or ambiguity in the record in the light least favorable to Harris. Harris’s prior experience with telecommuting under Gordon — to the extent *778 the informal, sporadic arrangement can even be considered a full “experiment”— involved teleworking during non-core business hours only. R. 60-2 (Gordon Decl. ¶ 8) (Page ID # 1029-30). It is not clear from the record whether Harris’s two pri- or experiences with telecommuting under her supervisor Dawn Gontko were flextime telework arrangements, or telework during core business hours. R. 60-3 (Gontko Deck ¶ 3) (Page ID # 1043) (stating that she “agree[d] to permit [Harris] two trial Alternative Work Schedule (‘AWS’)/telecommute periods” and defining AWS as “a Ford program where employees, with supervisor approval, are permitted to work four 10 hour days per week,” without specifying whether or what portion of those days are during core business hours). If flex-time, the fact that Harris was unable “to establish regular and consistent work hours,” as Gontko stated, does not necessarily mean that Harris would not consistently work in the set timeframe of core business hours if she were not given flexibility in her work hours. Id. ¶ 3 (Page ID # 1043). The uncertainty about the nature of Harris’s two prior telework experiences also makes it difficult to evaluate Gontko’s statement that Harris failed “to perform the core objectives of the job.” R. 607 (Gontko Dep. at 20) (Page ID # 1089). If Harris were allowed to telework only outside of core business hours, as occurred with Gordon, she may not have been able to access information necessary to perform her job or to reach co-workers. Similar problems would not arise if she had been permitted to telework during core business hours. The key point is that the current record does not resolve these ambiguities. At the summary-judgment stage, we are required to read the facts in the light most favorable to Harris. Here, that would mean assuming such prior telework experiments were not during core business hours. The majority, yet again, assumes the opposite.
D. The EEOC created a genuine dispute of material fact whether Ford failed to engage sufficiently in the interactive process to clarify Harris’s telecommuting request.
There is a genuine dispute of material fact whether Ford sufficiently engaged in the interactive process to clarify Harris’s telecommuting request. The majority places an unreasonable and likely unachievable burden on employees to propose the perfect accommodation from the start of the process. That burden is directly at odds with the EEOC regulations’ insistence that both the employee and the employer have an obligation to participate in the interactive process and, through that participation, to develop and clarify whether a reasonable accommodation is possible. Ford did not seriously try to clarify Harris’s initial teleworking request, and instead focused on building a case for why she could not telework.
The ADA’s regulations state that, “[t]o determine the appropriate reasonable accommodation [for an employee,] it may be necessary for the [employer] to initiate an informal, interactive process with the [employee].” 29 C.F.R. § 1630.2(o )(3). We, along with many other circuits, have held that the employer’s duty to participate in the interactive process in good faith is mandatory. See, e.g., Kleiber, 485 F.3d at 871 (citing cases). If there is a genuine dispute of material fact whether the employer sufficiently engaged in the interactive process, summary judgment for the employer should be denied. See, e.g., Phelps v. Optima Health, Inc., 251 F.3d 21, 27 (1st Cir.2001); Rehling v. City of Chi., 207 F.3d 1009, 1016 (7th Cir.2000); Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 954 (8th Cir.1999).
*779 Although the employee must trigger the interactive process by requesting a reasonable accommodation, an employee’s initial request does not need to identify the perfect accommodation from the start, as the majority seemingly requires. 29 C.F.R. § 1630, app. § 1630.9 (“In general, ... it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.”). Such a requirement would render the employer’s duty to engage in the interactive process to “identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations” meaningless. 29 C.F.R. § 1630.2(o )(3); see also Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 316 (3d Cir.1999) (“The ADA’s regulations make clear that the purpose of the interactive process is to determine the appropriate accommodations____ Therefore, it would make little sense to insist that the employee must have arrived at the end product of the interactive process before the employer has a duty to participate in that process.”); Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir. 1996) (“The employer has at least some responsibility in determining the necessary accommodation.”).
Because the interactive process is not an end in and of itself, the employee must present evidence that a reasonable accommodation could have been identified if the employer had engaged sufficiently in the interactive process. See, e.g., Keith v. Cnty. of Oakland, 703 F.3d 918, 929 (6th Cir.2013) (holding that summary judgment was not warranted on whether the employer adequately engaged in the interactive process because the employee “met his burden to show that a reasonable aecommodation was possible”). But that reasonable accommodation does not need to be the employee’s initial request.
Here, Harris met her initial burden to trigger the interactive process by initially requesting telework up to four days a week. For the reasons explained above, there is a genuine dispute of material fact whether her initial request was itself a reasonable accommodation. Even if not, however, the EEOC has identified a reasonable accommodation that Harris testified she would have accepted if Ford had engaged in the interactive process: telework on one to two specified days per week, with the requirement that she take sick leave if her IBS flared up on a different day.[5] Appellant Supp. Br. at 1. It is an accommodation that largely parallels the telework agreements other resale buyers had with Ford, and thus Ford cannot credibly claim that this proposal would be an unreasonable accommodation or that the arrangement would make it impossible for Harris to perform the essential functions of her job. The majority ignores this additional accommodation identified by the EEOC that would have rendered Harris a qualified individual. Maj. Op. at 766.
A reasonable jury could find that Ford did not in good faith seek to clarify Harris’s telework request or explore whether some telework arrangement was feasible. The Seventh Circuit has articulated a case-by-case approach to determining which party is most responsible for the breakdown in the interactive process. As the court explained:
No hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the *780 purpose of either avoiding or inflicting liability. Rather,-courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility-
Beck, 75 F.3d at 1135 (emphasis added).
Taking the facts in the light most favorable to Harris, Ford is more to blame for the breakdown of the interactive process than Harris. It is true that Ford met with Harris to discuss her request and proposed alternative accommodations, factors that courts have identified as indicators of “good faith” participation. See Taylor, 184 F.3d at 317. However, the EEOC persuasively argued that a reasonable jury could find that the alternatives Ford suggested were not reasonable accommodations because they did not address the problems Harris identified. Harris still might soil herself even in the shorter time it would take her to get to the restroom from a closer work cubicle. Moreover, it is unreasonable to respond that Harris could wear Depends or clean herself up after any accidents. Harris should not have to suffer the embarrassment of regularly soiling herself in front of her coworkers. Ford’s other alternative — to help Harris find a different position within Ford, R. 60-4 (Jirik Decl. ¶ 9) (Page ID # 1049) — was not a reasonable accommodation because Ford did not guarantee that such a position existed. Further, we have previously held that reassignment is reasonable only when the employer demonstrates that it would be an undue hardship to accommodate the employee in his or her current position. Cassidy v. Detroit Edison Co., 138 F.3d 629, 634 (6th Cir.1998). Thus, Ford did not propose reasonable alternative accommodations, so those offers do not conclusively establish its good-faith participation in the interactive process. Cf. Beck, 75 F.3d at 1136 (holding that an employer sufficiently participated in the interactive process in part because the employee “offer[ed] no evidence that” the alternative accommodation proposed by her employer “was an unreasonable accommodation”).
The real issue is that Ford chose to interpret Harris’s request to telework as a final offer, rather than as an opening bid. Of critical importance, the notes Ford submitted from its April 6, 2009, meeting with Harris to discuss telework indicate that Ford understood that Harris was not necessarily requesting to telework four days per week. R. 66-10 (Meeting Notes at 3) (Page ID # 1320). Gordon likewise indicated in his declaration that he understood Harris’s request was for “up to four days per week” of telework, not necessarily four days per week, every week. R. 60-2 (Gordon Decl. ¶ 11) (Page ID # 1033-34) (emphasis added). Nevertheless, Ford did not explore more limited telework options with her. Rather, Ford effectively shut down all discussion of telework options after the April 15, 2009, meeting when Gordon told Harris that “her job could not be performed with a telecommuting arrangement” that allowed “Harris ... to telecommute an unpredictable ‘up to four days per week.’ ” R. 60-2 (Gordon Decl. ¶ 12) (Page ID # 1034) (emphasis added). And Harris did not fail to provide critical information about her condition that would have enabled Ford to help clarify her request for telework, a circumstance that some courts have pointed to in placing more blame on the employee for the breakdown of the *781 interactive process. Cf. Beck, 75 F.3d at 1137.
Ford cannot escape the consequences of its insufficient participation by pointing to the fact that Harris did not re-approach Ford after the April 15 meeting to discuss other accommodations, or that it proposed counteroffers even though it may not have been legally required to do so. If Ford had seriously attempted to clarify Harris’s initial request, or offered indisputably reasonable alternative accommodations, the fact that Harris did not re-approach Ford might make her the more blameworthy party. But Ford never sufficiently engaged with Harris’s initial request. She did not need to make another request because her original request was never sufficiently considered or explored in the first place. Even if Ford had sufficiently considered Harris’s initial request, that does not end the matter. The EEOC Enforcement Guidance notes that “[t]he duty to provide reasonable accommodation is an ongoing one.” EEOC Enforcement Guidance on Reasonable Accommodation ¶ 32, http://www.eeoc.gov/policy/docs/ accommodatioh.html. As the Ninth Circuit has explained with reference to this guidance, “the employer’s obligation to engage in the interactive process extends beyond the first attempt at accommodation.” Humphrey, 239 F.3d at 1138. After the first attempt to identify a reasonable accommodation failed, Ford made no effort to continue the process, despite knowing that Harris continued to suffer from IBS. In fact, Ford explicitly told Harris that she bore the sole burden to identify another accommodation, abdicating any responsibility on its part to help in that process. R. 66-10 (Mtg. Notes at 6) (Page ID # 1323) (“[Karen Jirik] said that she ... is willing to talk with [Harris] again if she identifies another accommodation.” (emphasis added)). It is understandable that Harris might have concluded that further requests would have been fruitless after Ford conclusively told her that telework would not work and ignored her insistence that her initial request merely quoted Ford’s own telecommuting policy.
In sum, Ford did not seriously pursue an accommodation with Harris that addressed the key challenge she identified— physical presence every day of the week at Ford’s work site. Instead, Ford approached the discussion of telework from its first meeting with Harris by reading her request as expansively as possible and then narrowly focusing on why it would not work. Ford ignored Harris’s insistence that she had merely quoted the language of the telework policy and that she was open to more limited telework arrangements. Ford proposed two alternatives that did not address the problems Harris faced with her IBS and were not reasonable accommodations. After shutting down all further discussion of telework, Ford did not make any attempt to pursue further discussions with Harris in the interactive process. This is far from sufficient participation, and thus summary judgment should be denied on this basis as well.
E. The EEOC created a genuine dispute of material fact whether Ford retaliated against Harris for filing a charge with the EEOC.
Harris presented more than sufficient evidence to preclude summary judgment on her ADA retaliation claim. After Harris filed her charge with the EEOC, three potentially suspicious events occurred: for the first time, Ford changed Harris’s performance rating to signify poor performance for problems that had been ongoing for years; Ford put Harris on a performance-enhancing plan (“PEP”), a plan that Harris testified in her deposition was in part designed for her to fail; and Harris’s *782 supervisor began holding intimidating meetings with Harris to discuss her performance problems. Ultimately, Ford fired Harris only four months after she filed her charge. A reasonable jury could certainly infer from the timing and nature of these events that Ford fired Harris in retaliation for the charge she filed with the EEOC.
More specifically, first, the EEOC met its burden to establish a prima facie case of retaliation — that retaliation was the but-for cause of Harris’s termination — by pointing to two pieces of evidence: (1) the temporal proximity between Harris filing a charge with the EEOC and her termination; and (2) that the problems Ford identified with Harris’s performance existed before and after she filed her charge with the EEOC, but prompted an overall negative performance review only after she filed her charge. R. 60-13 (2008 Performance Review) (Page ID # 1123-29); R. 60-12 (2007 Performance Review) (Page ID #1117-22); R. 60-14 (2006 Performance Review) (Page ID # 1130-35); R. 60-16 (2009 Interim Review) (Page ID # 1140-42). It is true that Ford moved to a new rating system in 2009, but it does not follow that Ford could have given Harris a low rating only under the new system. Ford could have ranked Harris as lower than “exceptional plus” under the old rating system, but chose not to do so. Even if “exceptional plus” were the default rating under the former system as Ford now claims, and attained by 80% of employees, Ford still chose to give Harris that rating in 2008 despite the fact that Ford argues she ranked in the bottom 10% of her peers in more detailed reviews. R. 60-2 (Gordon Decl. ¶ 13) (Page ID # 1035). The point is that only after Harris filed her charge with the EEOC did Ford decide to change her overall performance rating to signify poor performance for problems that had been ongoing for several years.
Under University of Texas Southwestern Medical Center v. Nassar, — U.S. -, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013), Harris does not need to prove that Ford would never have fired her, even at some later point, had she not filed her EEOC complaint. Her burden is to present evidence suggesting that Ford would not have fired her at the time it did if she had not filed her EEOC complaint. The Supreme Court recently provided an example of but-for causation that helps illustrate this point:
[Wjhere A shoots B, who is hit and dies, we can say that A [actually] caused B’s death, since but for A’s conduct B would not have died. The same conclusion follows if the predicate act combines with other factors to produce the result, so long as the other factors alone would not have done so — if, so to speak, it was the straw that broke the camel’s back. Thus, if poison is administered to a man debilitated by multiple diseases, it is a but-for cause of his death even if those diseases played a part in his demise, so long as, without the incremental effect of the poison, he would have lived.
Burrage v. United States, — U.S. -, 134 S.Ct. 881, 888, 187 L.Ed.2d 715 (2014) (emphasis added) (internal quotation marks and citation omitted). Like the man with multiple diseases in the second example, Harris eventually might have been fired because of her performance problems. The key question is whether the EEOC charge she filed was the poison that precipitated that firing to occur at the particular time it did. See also Montell v. Diversified Clinical Servs., Inc., 757 F.3d 497, 507 (6th Cir.2014) (“[I]n retaliation cases, courts must determine ‘what made [the employer] fire [the employee] when it *783 did,.’ ” (quoting Hamilton v. Gen. Elec. Co., 556 F.3d 428, 436 (6th Cir.2009)) (emphasis in original)).
Policy considerations also weigh against the majority’s crabbed reading of Nassar. Under the majority’s test, it would be impossible for employees with performance problems to bring a retaliation claim based on a theory that those performance problems did not truly motivate the employer to fire them. That cannot accord with the purposes of the ADA because employees with disabilities often will have performance problems precisely because of the struggles they encounter to manage those disabilities.
Second, the EEOC presented sufficient evidence to create a genuine dispute of material fact that Ford’s asserted reasons for firing Harris did not actually motivate Ford to fire her. Ford claimed it fired Harris because she failed to achieve the objectives of the PEP and because of her attendance problems. In addition to the two factors discussed above (i.e., the timing of the termination and the change in Harris’s overall performance rating), the EEOC pointed to two other pieces of evidence that suggest Ford was not actually motivated to fire Harris for the reasons it gave: (1) the design of the PEP; and (2) meetings Gordon held with Harris that she perceived as intimidating.
1. Design of the PEP
One of the PEP’s objectives was that Harris eliminate a backlog of paperwork. Harris testified in her deposition that the paperwork was pending only because she needed to wait for responses from suppliers and coworkers, not because she was slacking. R. 60-6 (Harris Dep. at 264) (Page ID # 1077). Thus, a reasonable jury could infer that the PEP was designed so that Harris would fail.
Harris’s testimony on why she thought the plan was designed for her to fail is not “blatantly contradicted by the record,” as the majority claims. Maj. Op. at 769. First, that Harris may have failed two prior performance plans does not objectively establish that the PEP was not designed for her to fail. The majority does not claim that those prior performance plans were exactly the same as the plan given Harris after she filed her discrimination charge. Nor could it, based on the current record. Second, the majority cites nothing in the record that supports its additional assertion that Ford used “similar” PEPs for other poorly performing employees or that those PEPs were similar with respect to the critical objective for this case, that Harris eliminate a backlog of paperwork. Maj. Op. at 769-70.
2. Meetings with Gordon
After Harris filed her charge with the EEOC, Harris’s supervisor Gordon began holding one-on-one, closed-door meetings with Harris that Harris perceived as intimidating. R. 60-6 (Harris Dep. at 218-24) (Page ID # 1066-67). A reasonable jury could certainly doubt that these meetings were meant to help Harris, and instead could decide that they were designed to hurt her. Harris recounted meetings that were not normal, professional interactions between a supervisor and employee discussing that employee’s performance. Rather, Harris testified that Gordon yelled at her repeatedly, threatened her, and even held one meeting on her attendance problems with all of her co-workers present. For example, Harris testified in her deposition that in one meeting Gordon “yell[ed]” at her “military style,” asking her “did [she] agree he was a good manager? He was a good manager, did [she] agree?” Id. at 219 (Page ID # 1066). In that same meeting, Harris testified that Gordon threatened her with an insubordi *784 nation charge when she asked to leave to address an urgent work matter. Id. Gordon also held a meeting with all of Harris’s co-workers to discuss Harris’s attendance problems. R. 60-2 (Gordon Decl. ¶ 19) (Page ID # 1038). At the meeting, Gordon discussed, in explicit terms, the nature of Harris’s illness, which she had previously kept private. R. 41-3 (Harris Dep. at 329) (Page ID # 627). Harris found that meeting so upsetting that she eventually left the room in tears and had a panic attack. Id. at 326-29 (Page ID # 627). Thus, Harris did not just express “ ‘subjective skepticism regarding the truth of whether Gordon was actually trying to help her.” Maj. Op. at 768 (quoting Hedrick v. W. Reserve Care Sys., 355 F.3d 444, 462 (6th Cir.2004)). She made factual allegations about the unprofessional ways in which Gordon conducted those meetings— yelling at her, threatening her, etc. — from which a reasonable juror could conclude that Gordon held those meetings to retaliate against Harris for filing her charge with the EEOC.[6]
There is also a genuine dispute of material fact concerning whether Lisa King was the sole 'decisionmaker in Harris’s termination. Ford and the majority assert that King made the decision to fire Harris by herself and that Gordon was on vacation at the time. R. 60-2 (Gordon Decl. ¶ 26) (Page ID # 1041); R. 60-4 (Jirik Decl. ¶ 17) (Page ID # 1053); R. 60-15 (Kane Decl. ¶ 8) (Page ID # 1138). King supervised Mike Kane, who in turn supervised Gordon. R. 66-23 (King Dep. at 26) (Page ID # 1368). King’s deposition testimony about the termination decision, however, portrays the decision as a group decision, involving everyone in Harris’s supervisory chain, including Gordon, and people from HR. When asked about her role in Harris’s termination decision, King responded:
My role was one of understanding the actions that we were taking, being responsible with the team for consensing [sic] that we were comfortable that we were taking actions, and the team in question would have .been the varied levels of supervision in the chain and the HR organization. So when we were making decisions, those were consensed [sic] decisions. I would be a participant within those discussions. And then I was also responsible for oversight of the actions that we were taking to ensure that they were fair and reasonable, that we were acting within policy, those types of things.
R. 66-23 (King Dep. at 27) (Page ID # 1368) (emphasis added). In response to the question “[W]ho do you recall being part of the team that you just testified ... [was] involved in the termination of Jane Harris?” King responded, “So the folks that would be involved are the three I said operationally,” — “John Gordon, Mike Kane, and myself’ — “That was her supervisory chain. And then within HR, Karen Jirik would have been involved, at certain points Leslie Pray, and at certain points Stephanie Covington.” Id. at 27-28 (Page ID # 1368). King also characterized the decision to fire Harris as having been reached over several meetings. R. 60-5 (King Dep. at 67) (Page ID #1058). Thus, a reasonable jury could conclude that Gordon was actually involved in the *785 decision to fire Harris. Gordon’s potentially retaliatory conduct can therefore certainly help establish pretext.
Even if King were the sole decisionmaker, there is a genuine dispute of fact whether Gordon’s potentially retaliatory conduct is sufficient to establish “cat’s paw” liability. In the context of retaliation claims, “cat’s paw liability will lie ... if (1) non-decisionmakers took actions intended” to cause the adverse employment action against the employee “in retaliation for his protected conduct, and (2) those retaliatory actions were a but-for cause of’ the adverse employment action. Seoane-Vazquez v. Ohio State Univ., 577 Fed.Appx. 418, 428 (6th Cir.2014).
As to the first element, a reasonable jury could infer that the meetings Gordon held with Harris about her performance demonstrated a retaliatory animus towards her. Gordon was responsible for writing Harris’s performance evaluations, and he also designed the PEP along with his supervisor Mike Kane. R. 60-2 (Gordon Decl. ¶ 13, 20) (Page ID #1034-35, 1039). A reasonable jury could therefore conclude that Gordon’s retaliatory animus towards Harris infected his assessment of Harris’s performance and the design of the PEP. Moreover, Gordon made the assessment that Harris had not met many of the PEP objectives. Id. ¶¶ 21-25 (Page ID # 1039-40); R. 60-18(PEP) (Page ID # 1144-50). As for intent, Gordon wrote on Harris’s 2009 Interim Performance Review that “[i]f significant improvement is not noted during [the 30-day PEP] time period ..., Ms. Harris’ employment with Ford Motor Company may be terminated.” R. 60-16 (2009 Interim Review at 2) (Page ID # 1141). Given that Gordon knew the consequences of failing to achieve the PEP objectives, a reasonable jury could infer that, because Gordon found that Harris failed, he intended to cause Harris to be fired.
Whether King made a sufficiently independent investigation into Harris’s performance such that Gordon’s actions were not the but-for cause of Harris’s termination is in dispute. Staub v. Proctor Hosp., 562 U.S. 411, 421, 131 S.Ct. 1186, 1193, 179 L.Ed.2d 144 (2011) (“[I]f the employer’s investigation results in an adverse action for reasons unrelated to the supervisor’s original biased action ..., then the employer will not be liable.”). King’s deposition does not explain whether she performed an independent assessment of Harris’s progress in achieving the PEP objectives or of Harris’s performance generally. R. 60-5 (King Dep.) (Page ID # 1054-58). Notably, she does not say that she would have fired Harris for her absences alone, a factor independent of Gordon’s influence. Id. Other supervisors characterized the decision that Harris had not met the PEP objectives as a group effort, with King making the final decision, but it is not clear to what extent King’s decision was independent of Gordon’s assessment. See, e.g., R. 60-4 (Jirik Decl. ¶ 17) (Page ID # 1053) (“At the conclusion of the 30 days, it is my understanding that Ms. Harris’ management team (i.e., Lisa King, Mike Kane and John Gordon) determined that she had not met many of the PEP objectives.”). Thus, there is a genuine dispute of material fact whether Gordon’s actions could establish cat’s paw liability.
Even if not sufficient to create a genuine dispute of material fact on cat’s paw liability, Gordon’s actions are relevant circumstantial evidence of pretext. As we have explained:
Although discriminatory statements by a nondeeisionmaker, standing alone, generally do not support an inference of discrimination, the comments of a *786 nondecisionmaker are not categorically excludable. Circumstantial evidence establishing the existence of a discriminatory atmosphere at the defendant’s workplace in turn may serve as circumstantial evidence of individualized discrimination directed at the plaintiff. While evidence of a discriminatory atmosphere may not be conclusive proof of discrimination against an individual plaintiff, such evidence does tend to add “color” to the employer’s decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff.
Ereegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 356 (6th Cir.1998) (internal quotation marks and citations omitted). This reasoning applies with equal force to retaliatory conduct. Several factors that we have found to increase the probative value of such statements or conduct are present here: Gordon is a supervisor in Ford’s hierarchy, not a co-worker; Gordon’s meetings were held close in time to the termination decision; and his actions “buttressE ] other evidence of pretext.” Id. at 357 (discussing these factors). Moreover, Gordon was involved in most of the meetings about Harris’s poor performance before the actual termination decision, “a factor the Ereegovich Court found indicative of the intermediate employee’s influence over the employment decisions.” Chattman v. Toho Tenax Am., Inc., 686 F.3d 339, 353 (6th Cir.2012).
II. CONCLUSION
The majority fails to engage in the fact-intensive, case-by-case determination required by the ADA and by EEOC regulations interpreting the ADA to assess Harris’s claims. The majority consistently refuses to take the posture that summary judgment requires. Instead, it takes the facts in the light least favorable to Harris or determines for itself that Harris’s testimony is not credible. When the EEOC regulations and the standards of summary judgment are faithfully applied, clearly the EEOC has presented sufficient evidence to create a genuine dispute of material fact concerning whether Harris is a qualified individual, either because physical presence is not an essential function of her job or because telework is a reasonable accommodation for her, and regarding whether Ford retaliated against Harris for filing a charge with the EEOC. I therefore dissent, and would REVERSE the district court and REMAND for proceedings consistent with this opinion.

. Ford’s meeting notes are not even consistent as to how many of Harris’s job responsibilities could in no way be performed remotely. In its second meeting with Harris on April 15, 2009, Ford’s meeting notes list only three of Harris’s ten job responsibilities as ones that “could not be conducted from home” or "could not have been done remotely.” R. 66-10 (Mtg. Notes at 4-5) (Page ID # 1321-22). Three tasks are labeled as ones that "[c]an be done from home” or remotely. Id. For Harris’s remaining job responsibilities, Ford falls back on its contention that the tasks are "often done face to face” or require “a high level of interaction” with other parties. Id. at 4-5 (Page ID # 1321-22).

. Ford did not present any evidence suggesting Harris would be unable or less able to make site visits if she telecommuted for some period of time each week. In contrast, the EEOC did present evidence suggesting that allowing Harris to telework would likely increase her ability to make such visits reliably in the future. Harris’s doctor wrote that her IBS outbreaks would likely become progressively fewer and less frequent the longer Ford allowed her to telework: "If she were allowed to work from home/telecommute when her IBS was bad ... [h]er work productivity and her health- would both improve." R. 41-5 (Ladd Ltr.) (Page ID # 631). A second doctor testified in his deposition that “there was [sic] times like up to a year” when Harris was without IBS symptoms "because she wasn’t stressed.” R. 64-7 (Donat Dep. at 16) (Page ID #1211).

. The court in Vande Zande only briefly described the plaintiff's job as “that of a program assistant, and involved preparing public information materials, planning meetings, interpreting regulations, typing, mailing, filing, and copying.” 44 F.3d at 544.

. Harris's request for telework did not specify whether it was for flex-time or during core business hours, stating only that "[p]er my disability and Ford's Telecommuting policy, I am asking Ford to Accommodate my disability by allowing me to work up to four days per week from home.” R. 60-10 (Page ID # 1100). The definition of telecommuting in Ford’s policy is “a voluntary agreement between an employee and local management whereby the employee performs a portion of their normally scheduled work from an agreed upon alternate work site.” R. 6011 (Telecommuting Policy at 2) (Page ID # 1103) (emphasis added). Thus, Harris’s request could be read as a request to telework during normally scheduled work hours only. Taking the facts in the light most favorable to Harris, Harris's request should be construed as a request to telework during core business hours only.

. Ford is correct that Harris did not specifically attest that she would have accepted one to two days of telework on prescheduled days. But neither did she attest that she would not have accepted such an arrangement. R. 66-3 (Harris Decl. ¶ 17) (Page ID # 1264) ("If Ford had offered to let me telecommute 1-2 days per week, that would have been acceptable.”).

. The majority’s citation to Keever v. City of Middletown, 145 F.3d 809 (6th Cir.1998), is inapposite. The plaintiff-employee in that case (Keever) did not allege that the ”[c]onversations between [him] and his superiors about his performance" were conducted in any unprofessional way, as Harris alleges here. Id. at 813. Moreover, the passage quoted by the majority addressed whether the meetings described by Keever were sufficiently severe to create a hostile work environment, not whether those meetings might be evidence of pretext. Id.